**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Kenneth E. HOLLIS,**
**Defendant-Appellant.**

**No. 83–5071.**

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 8, 1983.

Decided Jan. 16, 1984.

Rehearing and Rehearing En Banc
Denied March 2, 1984.

James A. Shuffett, Lexington, Ky., for defendant-appellant.

Louis De Falaise, U.S. Atty. (argued), Robert F. Trevey, Asst. U.S. Atty., Lexington, Ky., for plaintiff-appellee.

Before ENGEL and KENNEDY, Circuit

Judges, and MORTON,* Chief District Judge.

CORNELIA G. KENNEDY, Circuit Judge.

Hollis appeals his jury convictions of one count of extortion in violation of the Hobbs Act, 18 U.S.C. § 1951,[1] and three counts of violating the Travel Act, 18 U.S.C. § 1952(a)(3).[2] Hollis contends that his convictions must be reversed, among other reasons, because the evidence was insufficient to show the effect on commerce required for a Hobbs Act violation.[3]

Hollis, General Counsel for the Kentucky Department of Labor from 1976 to 1980, was convicted of extorting $2100 from Dr. Travis Pugh, a Florida physician, by threatening to withhold payment for Pugh's services unless Pugh returned part of the payment to Hollis. Pugh had performed services for the Kentucky Department of Labor under an agreement made through Hollis.

Pugh and an associate established the I & D Center, a clinic in Kentucky for reading x-rays of potential black lung disease victims for the Kentucky Department of Labor, in April of 1976. Pugh moved his family to Kentucky with the intention of staying one year, but returned to Florida after ten days because there were not enough x-rays to be read in Kentucky. Pugh nonetheless continued to read x-rays in Florida for the Kentucky Department of Labor, receiving x-rays and sending reports by mail and flying to Kentucky whenever needed for depositions.

This continued even after the I & D Center closed in September of 1976, although Pugh agreed to allow Hollis to withhold one payment to insure Pugh's return to Kentucky whenever depositions were needed. Pugh notified Hollis that he would no longer do any work for the Kentucky Department of Labor in early February of 1977 and returned to Kentucky for the last group of depositions later that month. The bill for that final group of depositions was $5000.

Pugh testified that in October of 1977 Hollis called him and threatened to hold up his check for $5000 for another six months to a year unless he gave Hollis half the amount of the check. Because Pugh needed the money immediately, he testified, he finally agreed to pay Hollis $2100. Hollis called Pugh again two days later to make travel arrangements, and a few days after the initial call he flew to Florida, where Pugh picked Hollis up at the airport. The two then drove to Pugh's bank, where Pugh deposited the $5000 check Hollis had brought him, immediately withdrew $2100 cash, and gave the cash to Hollis. Hollis then returned to Kentucky.

---

* Honorable L. Clure Morton, Chief Judge, United States District Court for the Middle District of Tennessee, sitting by designation.

1. The Hobbs Act provides in part:
    (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion ... shall be fined ... or imprisoned ....
    (b) As used in this section—

    . . . . . .

    (3) The term "commerce" means commerce ... between any point in a State ... and any point outside thereof ....
    18 U.S.C. § 1951.

2. The Travel Act provides in part:
    (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

    . . . . . .

    (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined ... or imprisoned ....
    (b) As used in this section, "unlawful activity" means ... (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.
    18 U.S.C. § 1952.

3. Since the government did not prove any violation of state extortion laws, the Travel Act convictions were based entirely on the federal Hobbs Act violation. Accordingly, if the Hobbs Act conviction is reversed so must be the Travel Act convictions.

The Hobbs Act penalizes "[w]hoever in any way or degree ... affects commerce ... by robbery or extortion." 18 U.S.C. § 1951(a). Courts have consistently held that this language requires only a de minimis effect on commerce. *E.g., United States v. Richardson,* 596 F.2d 157 (6th Cir. 1979); *United States v. Billups,* 692 F.2d 320 (4th Cir.1982); *United States v. French,* 628 F.2d 1069 (8th Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980); *United States v. Hathaway,* 534 F.2d 386 (1st Cir.), *cert. denied,* 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976); *United States v. Brown,* 540 F.2d 364 (8th Cir. 1976). The Supreme Court has said that the Hobbs Act was intended "to use all the constitutional power Congress has to punish interference with interstate commerce." *Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960). *See also* S.Rep. No. 532, 73d Cong., 2d Sess. 1 (statute designed "to extend Federal jurisdiction over all restraints of any commerce within the scope of the Federal Government's constitutional powers") (concerning predecessor of Hobbs Act). And in *United States v. Harding,* 563 F.2d 299, 301–02 (6th Cir.1977), *cert. denied,* 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978), this Court approved the Seventh Circuit's holding in *United States v. Staszcuk,* 517 F.2d 53 (7th Cir.) (en banc), *cert. denied,* 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975), that it is sufficient that there is a "realistic probability" that the extortion would affect commerce.

█ A physician's services if interstate in character may constitute commerce. In *Tarleton v. Meharry Medical College,* 717 F.2d 1523, 1531 (6th Cir.1983), this Court found that movement of patients across state lines to a medical facility constituted commerce. If interstate movement of patients is commerce, we see no reason why the interstate movement of a physician or of his work product would not also be commerce. *Cf. United States v. Oregon State Medical Society,* 343 U.S. 326, 338, 72 S.Ct. 690, 697, 96 L.Ed. 978 (1952) (services offered by medical society not commerce since "wholly intrastate"). The evidence in the present case shows that Pugh, a Florida physician, read x-rays of Kentucky patients in Florida and mailed his reports from Florida to Kentucky. He also traveled from Florida to Kentucky to give depositions. Pugh's services rendered to the Kentucky Department of Labor therefore constituted commerce. Similarly, the payments made by the Kentucky Department of Labor to Pugh were also commerce. *See Goldfarb v. Virginia State Bar,* 421 U.S. 773, 787–88, 95 S.Ct. 2004, 2013, 44 L.Ed.2d 572 (1975) (exchange of attorneys' services for money is commerce); *Tarleton, supra; Ballard v. Blue Shield, Inc.,* 543 F.2d 1075, 1079 (4th Cir.1976) ("the payment exchanged for professional services constitutes trade or commerce"), *cert. denied,* 430 U.S. 922, 97 S.Ct. 1341, 51 L.Ed.2d 601 (1977).[4]

Hollis contends that his extortion nonetheless did not affect any of this commerce because at the time of the extortion Pugh had ceased performing services in commerce. Since Pugh had already withdrawn from commerce, and there was no evidence concerning the likelihood that he would reenter commerce, Hollis argues that the government has not proven any effect on commerce. The parties argue the applicability of various decisions concerning sufficiency of an indirect effect on commerce caused by extortion by or from a business that engages in commerce. *E.g., United States v. Mattson,* 671 F.2d 1020 (7th Cir. 1982). However, the possibility of an indirect effect need not be considered if the extortion had a direct effect on commerce.

---

**4.** All the cases cited in this paragraph involve the meaning of "commerce" under the Sherman Act. However, since the Hobbs Act was intended to use the full congressional power to regulate commerce, *Stirone, supra,* any activity that may constitute commerce under the Sherman Act may also constitute commerce under the Hobbs Act. There is nothing in the Hobbs Act that would restrict its reach to interstate movement of tangible goods. *See United States v. Gates,* 616 F.2d 1103 (9th Cir.1980) (solicitation of tourist business is commerce under the Hobbs Act).

■ Such a direct effect on commerce is evident in the present case. The payments made by the Kentucky Department of Labor to Pugh for his services constituted interstate commerce. Payment for the services was an essential part of the interstate transaction. But for the extortion, Pugh would have been paid $5000 for the final group of depositions. Because of the extortion, Pugh only received $2100.[5] Hollis' extortion therefore directly affected the amount of payment that moved in interstate commerce.

In *United States v. Hyde,* 448 F.2d 815, 836 (5th Cir.1971), *cert. denied,* 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972), the Fifth Circuit said that "[n]either the [Hobbs Act] nor the Constitution requires that the company be engaged in an interstate transaction at the moment of the extortion to support federal jurisdiction." This is a case where the victim *was* engaged in an interstate transaction at the moment of the extortion, albeit in the payment end rather than the delivery end of the transaction. The present case is analogous to the situation in *United States v. French,* 628 F.2d 1069 (8th Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980). In *French,* a St. Louis city marshal was convicted under the Hobbs Act of accepting reduced settlements for forfeited bail bonds owed the city in return for cash payments. The bail bondsman acted as agent for a New York insurance firm. The court found that "the moment the extortionate payment was made, there was an effect on interstate commerce." 628 F.2d at 1078.[6]

There is nothing in the legislative history of the Hobbs Act that would require an effect on commerce subsequent to, rather than contemporaneous with, the extortion. The House Committee on the Judiciary said in its report on the proposed Act, "those persons who have been impeding interstate commerce and levying tribute from free-born American citizens engaged in interstate commerce shall not be permitted to continue such practices." H.R.Rep. No. 238, 79th Cong., 2d Sess., *reprinted in* 1946 U.S. Code Congressional Service 1360, 1370. Levying tribute from persons engaged in interstate commerce would normally include levying tribute from one engaged in commerce at the moment the levy is exacted. Congressional intent to include a broad range of effects on commerce is even clearer when the language of the Anti-Racketeering Act of 1934, the Hobbs Act's predecessor, is considered. That statute penalized: "Any person who, in connection with or in relation to any act in any way or in any degree affecting trade or commerce [extorts]." 48 Stat. 979. This language is broad enough to include even effects on commerce that occur before the extortion. For instance, Hollis' agreement to pay Pugh for reading x-rays in Florida was an act affecting commerce, and Hollis' subsequent extortion could be said to be in connection with that act. The Hobbs Act was intended to broaden, not contract, the scope of the earlier anti-racketeering law. *United States v. Staszcuk,* 517 F.2d 53, 56–57 (7th Cir.) (en banc), *cert. denied,* 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975). We need not rely on the 1934 Act, however, since the language of the current statute is broad enough to include effects on commerce contemporaneous with an extortion. The evidence against Hollis was sufficient to satis-

---

5. The transaction between Pugh and Hollis could also be characterized as receipt by Pugh of $5000 followed by a $2100 payment from Pugh to Hollis. The $2100 payment to Hollis was also commerce, however, since Hollis immediately took the money from Florida back to Kentucky. The practical effect of the extortion is the same under either characterization: instead of $5000 moving from Kentucky to Florida, only $2900 ends up in Florida.

6. *French* is not exactly on point with the present case, since in *French* there was no proof that the bondsman was acting for the out-of-state firm with respect to the particular bonds involved. The *French* court therefore had to rely on extortion from a business engaged in commerce rather than extortion of a payment itself in commerce. However, the fact that the *French* court noted that lack of proof suggests that the court would have found its decision easier had the bonds been underwritten by the out-of-state firm.

fy the commerce element of the Hobbs Act.[7]

Hollis also contends that a portion of the District Court's charge to the jury was impermissibly coercive and that the government's actions during discovery require reversal. We have considered these contentions and find them without merit.

Accordingly, the judgment of the District Court is affirmed.

---

**7.** We need not consider whether the acts that formed the bases for the Travel Act violations (telephone calls and an airplane trip to Florida made by Hollis) or the possibility that the extortion may have dissuaded Pugh from re-entering commerce could constitute a sufficient effect on commerce.