**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Luther Langford TAYLOR,**
**Defendant–Appellant.**

**No. 90–5913.**

United States Court of Appeals,
Fourth Circuit.

Argued April 7, 1992.

Decided May 29, 1992.

Joel Wyman Collins, Jr., Collins & Lacy, Columbia, S.C., argued, for defendant-appellant.

John Michael Barton, Asst. U.S. Atty., Columbia, S.C., argued, (E. Bart Daniel, U.S. Atty., Scott N. Schools, Asst. U.S. Atty., on brief), for plaintiff-appellee.

Before WIDENER and NIEMEYER, Circuit Judges, and CHAPMAN, Senior Circuit Judge.

## OPINION

CHAPMAN, Senior Circuit Judge:

Luther Langford Taylor, Jr., was convicted of six counts of conspiracy to violate and violation of the Hobbs Act, 18 U.S.C. § 1951. This conviction resulted from monetary payments made to him, while he was a member of the South Carolina House of Representatives, by Ronald L. Cobb. Cobb was acting as a paid confidential informant for the FBI, which was investigating corruption within the South Carolina General Assembly. The FBI created a scam operation that focused on a House bill that would legalize pari-mutuel betting at race tracks. Cobb was provided an office in the AT & T building across the street from the South Carolina State House and a suite at the Town House Hotel. Both the office and suite were under video and audio surveillance. Videotapes of Cobb making cash payments to Taylor were introduced into evidence. The prosecution charged, and the jury found, that receipt of these payments violated the Hobbs Act, but Taylor contended, and still contends, that these payments were simply campaign contributions, which violated no state or federal law.

This appeal raises a number of exceptions, but our attention is focused first on the jury instructions,* which immediately

---

* The government argues that appellant failed to preserve this issue for review because adequate exception was not taken to the jury charge at trial. The record reveals that, although no exception was noted after the instructions were given, there was exception noted at the precharge conference to the charge that "extortion under color of official right does not require proof of specific acts." While the exception was not as specific as the rule requires, the Supreme Court in *McCormick v. United States*, — U.S. ——, 111 S.Ct. 1807, 114 L.Ed.2d 307 (1991), considered and decided the defective jury instruction although there was no exception taken in the district court. *McCormick*, — U.S. at —— n. 9, 111 S.Ct. at 1815 n. 9.

preceded the jury's verdict of October 25, 1990. These instructions, which may have been adequate at the time they were given, are now in conflict with the holding in *McCormick v. United States,* — U.S. ——, 111 S.Ct. 1807, 114 L.Ed.2d 307 (1991). Therefore, the judgments of conviction must be reversed and the case remanded for further proceedings consistent with this opinion.

## I.

■ In *McCormick,* the prosecution charged extortion by a West Virginia state legislator in violation of the Hobbs Act. McCormick claimed that the cash payments he had received were contributions to his campaign for reelection. These are the same contentions presented in the present appeal. The Supreme Court reversed McCormick's conviction because it found that the jury instructions did not properly inform the jury with respect to the application of the Hobbs Act to payments made to an elected state official, who admitted having received the payments, but claimed that they were campaign contributions which did not violate the federal statute. Faced with these conflicting assertions, the jury must be instructed as to what payments to an elected official violate the Hobbs Act. In *McCormick,* the Court recognized the problems that accompany a Hobbs Act prosecution of an elected official, who has received cash payments, and provided the legal definition of extortion which must be given to a jury considering this complex issue. The Court explained:

> Serving constituents and supporting legislation that will benefit the district and individuals and groups therein is the everyday business of a legislator. It is also true that campaigns must be run and financed. Money is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views and what they intend to do or have done. Whatever ethical considerations and appearances

may indicate, to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interest of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another, with his consent, "under color of official right." To hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation. It would require statutory language more explicit than the Hobbs Act contains to justify a contrary conclusion. Cf. *United States v. Enmons,* 410 U.S. 396, 411, 93 S.Ct. 1007, 1015, 35 L.Ed.2d 379 (1973).

This is not to say that it is impossible for an elected official to commit extortion in the course of financing an election campaign. Political contributions are of course vulnerable if induced by the use of force, violence, or fear. The receipt of such contributions is also vulnerable under the Act as having been taken under color of official right, but only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act. In such situations the official asserts that his official conduct will be controlled by the terms of the promise or undertaking. This is the receipt of money by an elected official under color of official right within the meaning of the Hobbs Act.

This formulation defines the forbidden zone of conduct with sufficient clarity. As the Court of Appeals for the Fifth Circuit observed in *United States v. Dozier,* 672 F.2d 531, 537 (1982):

---

Also, the charge given to Taylor's jury would allow his conviction under legal theories that are insufficient under *McCormick.* This could

result in a miscarriage of justice or in a denial of a fair trial and, therefore, qualify as plain error.

"A moment's reflection should enable one to distinguish, at least in the abstract, a legitimate solicitation from the exaction of a fee for a benefit conferred or an injury withheld. Whether described familiarly as a payoff or with the Latinate precision of *quid pro quo*, the prohibited exchange is the same; a public official may not demand payment as inducement for the promise to perform (or not to perform) an official act."

The United States agrees that if the payments to McCormick were campaign contributions, proof of a *quid pro quo* would be essential for an extortion conviction, Brief for United States 29–30, and quotes the instruction given on this subject in 9 Department of Justice Manual § 9–85A.306, p. 91938.134 (Supp. 1988–2): "campaign contributions will not be authorized as the subject of the Hobbs Act prosecution unless they can be proven to have been given in return for the performance of or abstaining from an official act; otherwise any campaign contribution might constitute a violation."

We thus disagree with the Court of Appeals' holding in this case that a *quid pro quo* is not necessary for conviction under the Hobbs Act when an official receives a campaign contribution. By the same token, we hold, as McCormick urges, that the District Court's instruction to the same effect was error.

\* \* \* \* \* \*

The Government nevertheless insists that a properly instructed jury in this case found that the payment at issue was not a campaign contribution at all and that the evidence amply supports this finding. The instructions given here are not a model of clarity, and it is true that the trial court instructed that the receipt of voluntary campaign contributions did not violate the Hobbs Act. But under the instructions a contribution was not "voluntary" if given with *any* expectation of benefit; and as we read the instructions, taken as a whole, the jury was told that it could find McCormick guilty of extortion if any of the payments, even though a campaign contribution, was made by the doctors with the expectation that McCormick's official action would be influenced for their benefit and if McCormick knew that the payment was made with that expectation. It may be that the jury found that none of the payments was a campaign contribution, but it is mere speculation that the jury convicted on this basis rather than on the impermissible basis that even though the first payment was such a contribution, McCormick's receipt of it was a violation of the Hobbs Act.

*Id.,* —— U.S. at ——, 111 S.Ct. at 1816–17.

The charge given to the *Taylor* jury suffers from the same deficiencies found in *McCormick.* The *Taylor* jury was instructed:

To establish attempted extortion under color of official right the government must prove that the defendant did something under the color of the office involved to attempt to cause the giving of the money. It is the misuse of the power of the public office to induce consent to the payment which is the gist of an offense of obtaining property under color of official right. Inducements can take many forms, some more subtle than others. Any inducement however subtle or severe is sufficient. The government is not required to prove that the defendant demanded or directly solicited the payment made or that he offered anything specific in return for it.

Inducement may be proven by circumstantial evidence as well as by direct evidence. You may, for example, properly take into account the defendant's deeds as well as his words in determining the impression, if any, he intended to convey. Inducement may be established by proof of any of the following:

One. Proof of a *quid pro quo.*

Two. Proof of a request, demand or solicitation no matter how subtle.

Three. Proof of custom or expectation of receiving payment such as might have been communicated by the nature of the

public official's prior conduct of his office.

Or Four[.] Reliance on a system of expecting payment in exchange for public favors if the public official establishes or acquiesces in the system and the person making the payment is aware of the expectation.

The term extortion as it applies in this case means the obtaining of money or property from another with his consent induced under color of official right. Extortion under color of official right is established if the defendant tries to obtain a payment of money not due to him with knowledge that the pay-off is motivated by the public office involved.

The law against attempting to obtain the property of another under color of official right prohibits efforts to obtain money through the misuse of public office where the money is not lawfully due or owing to the office involved. Inducement does not necessarily require a demand by the defendant. Inducement by a public official in the sense that he overtly solicits the payment is not an essential element of the offense, nor is it necessary for the government to prove as part of its case that the public official misused his office in the sense that he granted some benefit or advantage to the payer to which the payer was not entitled. It is enough that the payer transfers something of sufficient value to the public official that is not due the public official, with the expectation that the public official will extend to him some benefit or refrain some harmful action, and the public official accepts the thing of significant value knowing that it is being transferred to him because of his office.

Inducement can be the overt form of demand or in a more subtle form such as custom or expectation, such as might have been communicated by the nature of the defendant's prior conduct of his office.

\* \* \* \* \* \*

There need be no specific *quid pro quo* to establish extortion under color of official right. That is, the government need not prove that the defendant promised to do something in particular in return for the payment of money. Of course, if you find that a *quid pro quo* did exist, that would be evidence of misuse of office. So long as the defendant knows that the money sought would be paid because of the public office involved, there need be no promise with respect to official action in return for the payment. In other words, the essence of the offense is the corrupt effort to obtain payment as a result of the powers [of] public office and not solely as a result of the powers of a private individual.

(J.A., 988–90, 92).

The charge is prejudicial error because the jury could find the defendant guilty under the wrong standard. It is settled law that "a general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient, because the verdict may have rested exclusively on the insufficient ground." *Zant v. Stephens*, 462 U.S. 862, 881, 103 S.Ct. 2733, 2745, 77 L.Ed.2d 235 (1983). While the jury may have found that there was a *quid pro quo* supporting the payment from Cobb to Taylor, we may not assume this. Under the charge it is also reasonable to assume that the jury convicted on a finding of inducement established by:

Three. Proof of custom or expectation of receiving payment such as might have been communicated by the nature of the public official's prior conduct of his office[; or]

Four. Reliance on a system of expecting payment in exchange for public favors if the public official establishes or acquiesces in the system and the person making the payment is aware of the expectation.

(J.A., 989). Either of these alternate findings would be insufficient under *McCormick*.

Under the clear language of the charge, Taylor could have been convicted of extortion because of his prior conduct or custom, and not because of his conduct as set forth

in the present indictment. The charge is also subject to an interpretation by the jury that it could convict on a finding that Taylor acquiesced in a system "of expecting payment in exchange for public favors" even though he did not originate or participate in such a system. This could have the effect of making him guilty by association—if other legislators sold their votes to the extent that it became a system for transacting business, then he could be guilty although the payment to him was not made to him "in return for an explicit promise or undertaking by [him] to perform or not to perform an official act." *McCormick*, —— U.S. at ——, 111 S.Ct. at 1816.

The portion of the charge, "So long as the defendant knows that the money sought would be paid because of the public office involved, there need be no promise with respect to official action in return for the payment," (J.A., 992), would allow a Hobbs Act prosecution for almost all campaign contributions to incumbent officeholders. This is in direct conflict with *McCormick*, which observed that from the beginning of the Republic, election campaigns have been financed by private contributions. Campaign contributions are made "because of the public office involved," because the person seeking the contribution is either an officeholder or seeking to become an officeholder.

■ The trial judge did charge the jury that there was no South Carolina law prohibiting cash contributions in any amount and that it was not illegal in and of itself for elected legislators to solicit and accept campaign contributions from individuals having a special interest in pending legislation. The trial judge charged: "If you find that the defendant accepted money from Ron Cobb reasonably believing that the money was a legitimate campaign contribution, you must acquit the defendant on all counts in the indictment." (J.A., 991–92). This statement does not cure the defects mentioned above, particularly the opportunity of the jury to base its conviction on one of the unacceptable alternate grounds provided by the instructions.

Under *McCormick*, it is clear that the payment must be made "in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *McCormick*, —— U.S. at ——, 111 S.Ct. at 1816. This principle was not adequately set forth in the instructions given to the *Taylor* jury.

## II.

### (A)

■ Appellant claims error in the denial of his motion for acquittal because there was insufficient evidence of an effect upon interstate commerce. The Supreme Court has stated:

> [T]here are two essential elements of a Hobbs Act crime: interference with commerce, and extortion. Both elements have to be charged. Neither is surplusage and neither can be treated as surplusage. The charge that interstate commerce is affected is critical since the Federal Government's jurisdiction of this crime rests only on that interference.

*Stirone v. United States*, 361 U.S. 212, 218, 80 S.Ct. 270, 274, 4 L.Ed.2d 252 (1960).

Taylor argues that the government's case showed only a possible "down the road" effect on commerce by the alleged extortion and that there was no proof of a nexus between the alleged extortion and interstate commerce. He claims that, because the pari-mutuel bill did not pass the House and the Senate, and the Alpha Group Cobb claimed to represent was a sham, his activities, even if found to be extortion, could not have affected interstate commerce. We disagree.

First, there was evidence presented during the government's case-in-chief to support a finding of an effect upon interstate commerce. An economics professor testified as to the results of his study showing how the legalizing of pari-mutuel betting at South Carolina race tracks would stimulate South Carolina's economy by attracting out-of-state tourists. The director of the South Carolina Tourism Council also testified as to how increased tourism would

accompany such a change in the betting laws.

Second, while the government may not manufacture jurisdiction for substantive Hobbs Act violations by creating a sham business claiming an interstate component, we have held:

> The jurisdictional predicate may be satisfied though the impact upon commerce is small, and it may be shown by proof of probabilities without evidence that any particular commercial movements were affected.
>
> *    *    *    *    *    *
>
> It may be enough that the parties intended to complete a transaction which would have affected commerce, though their intention was frustrated.

*United States v. Brantley*, 777 F.2d 159, 162 (4th Cir.1985) (involving charge of conspiracy and attempting to violate the Hobbs Act), *cert. denied*, 479 U.S. 822, 107 S.Ct. 89, 90, 93 L.Ed.2d 42 (1986). There was sufficient evidence to show that had Taylor's effort to pass the bill been accomplished, it would have had an effect upon interstate commerce.

It is no defense that the Alpha Group was a sham organization created by the FBI and, therefore, could not have affected interstate commerce. This argument is also answered in *Brantley*:

> Upon a charge of conspiracy or an attempt to violate the Hobbs Act, it is simply irrelevant that, because of facts unknown to conspirators or to the actor, an actual effect upon commerce was impossible.
>
> This is consistent with the general rule applicable to inchoate offenses. Though the circumstances may be misapprehended, if one "purposely engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be," the actor is guilty of a criminal attempt. Model Penal Code, § 5.01(1)(a). The same principle is applicable when two or more persons conspire to engage in the conduct. The facts may be taken to be as the conspirators believed them to be.

*Id.* at 164.

### (B)

■ We find no merit to appellant's contention that the jurisdictional requirements of the Hobbs Act require interstate commerce to have been affected by the extortion and not by a result of the extortion. He argues that, while passage of a parimutuel bill by the South Carolina General Assembly might affect interstate commerce, his vote for the bill could not, in and of itself, affect such commerce. Our circuit has not drawn such a fine line, and the government's evidence showed that Taylor did much more than merely vote for the bill. He recruited other legislators to support the bill and was paid several hundred dollars by Cobb for each of these recruits. Taylor also agreed "to charge the hill" in an effort to get the bill out of committee and to the floor for a vote by the House. His efforts would have affected interstate commerce, if they had been successful.

### III.

■ Appellant argues that the Hobbs Act is unconstitutionally vague as it applies to the activities of state legislators and that Congress did not intend to regulate campaign financing of elected officials for state and local offices. This argument has been answered in *McCormick*, which held that contributions to elected state officials may violate the Hobbs Act when the contribution is given in exchange "for an explicit promise or undertaking ... to perform or not to perform an official act." *McCormick*, —— U.S. at ——, 111 S.Ct. at 1816.

### IV.

■ Because this case is being remanded for a new trial, we will address the exceptions relating to evidence. Taylor claims that although he repeatedly requested all exculpatory evidence from the government, pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the government did not produce all evidence bearing on Ron Cobb's credibility. Taylor

sought an unredacted FBI Form 302 reporting the various FBI interviews with Cobb, claiming that this information was necessary to impeach Cobb's testimony. However, appellant's brief indicates that, in subsequent trials arising out of Operation Lost Trust, a less redacted Form 302 was produced. This information and other credibility evidence which Taylor sought may now be available to him at a retrial. This reasoning also applies to his claims that Cobb made illegal payments to the late South Carolina Senator Jack Lindsay, Cobb used drugs during the investigation, the FBI returned to Cobb $20,000 that Cobb had invested in a cocaine deal resulting in his original arrest, and a video tape of an alleged cocaine transfer from Robert Kohn to Ron Cobb exists. Appellant is now aware of this evidence and may use it as the Rules of Evidence may provide at his retrial.

Although the extent of cross-examination to show witness bias and to attack credibility is committed to the sound discretion of the district court, we suggest that on retrial the court allow defense counsel to explore as appropriate any prior criminal activity of the witness Ron Cobb. The government argues that Cobb's testimony was not critical to its case and that his credibility was not a significant issue at trial, but a review of the transcript reveals that these arguments are ludicrous. Cobb was the cornerstone of the prosecution's case and his credibility was the paramount issue at trial. The defendant should be given considerable leeway in testing Cobb's credibility before the jury.

We have considered the remaining exceptions raised by the briefs and find no merit in them.

The judgments of conviction are reversed and this matter is remanded to the district court for further proceedings consistent with this opinion.

REVERSED AND REMANDED WITH INSTRUCTIONS.