[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
04/09/99
THOMAS K. KAHN
CLERK

----------------------------------------

No. 95-4908

----------------------------------------

D. C. Docket No. 94-422-CR-SH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BARRY KAPLAN,

Defendant-Appellant.

----------------------------------------------------------------

Appeal from the United States District Court
for the Southern District of Florida

----------------------------------------------------------------

**(April 9, 1999)**

Before HATCHETT, Chief Judge, and TJOFLAT, ANDERSON, EDMONDSON,
COX, BIRCH, DUBINA, BLACK, CARNES, BARKETT, HULL and MARCUS,
Circuit Judges.

EDMONDSON, Circuit Judge:

This controversy arises from defendant's conviction of attempted extortion and conspiracy to commit extortion under the Hobbs Act. We conclude that the government presented sufficient evidence to support the jury's findings for the Hobbs Act violations, and we affirm the convictions.

Background

In 1984 and 1985, Defendant Barry Kaplan, a resident of Miami, Florida, placed several hundred thousand dollars[1] into two Panamanian bank accounts through the aid of a Panamanian lawyer named Pablo Arosemena. Kaplan gave Arosemena power of attorney over the two bank accounts for the ostensible purpose of disguising Kaplan's ownership of the funds and thereby evading taxation in the United States. Between 1984 and 1989,

---

[1] Evidence indicates that Kaplan, in 1989, believed that he had a balance of approximately $550,000 remaining in the accounts.

transfers of funds were made[2] from the accounts to different banks located throughout the world.[3]

In 1988 or 1989, Kaplan, in financial peril, sought return of the money. But Arosemena refused and allegedly threatened Kaplan. Kaplan then enlisted the help of Mario Fonseca, another Panamanian lawyer, to attempt to recover the money. Fonseca investigated the matter and found that Arosemena had taken money from the accounts. Fonseca testified that Arosemena threatened to report Kaplan's offshore funds to the United States Internal Revenue Service if Kaplan pursued the matter.

After deciding against a civil suit or criminal prosecution against Arosemena in Panama, Kaplan discussed his predicament with Roy Gelber, then a Dade County Circuit Judge.[4]

---

[2]From the record, whether some or all of these transfers were made at Kaplan's request or whether Arosemena made the transfers for himself, to repay his own personal and business debts, is unclear.

[3]A Panamanian lawyer who investigated the accounts for Kaplan testified that approximately one million dollars had been "run through" the accounts.

[4]Gelber had previously represented Kaplan on another matter while Gelber was still in private practice.

Gelber then contacted Raymond Takiff, a Florida lawyer who had represented General Manuel Noriega, the de facto leader of Panama at the time.

Kaplan, Gelber and Takiff began to discuss the matter in June 1989 and continued to do so until the early part of 1990. Takiff claimed that he could facilitate the retrieval of Kaplan's money through his connections to the Panamanian Defense Force. Takiff reported to Gelber on many occasions, by telephone from various states, that he had been in Panama working on Kaplan's problem. Takiff also told Gelber that he would be utilizing an officer in the Panamanian Defense Force to obtain the funds from Arosemena and that this officer and his cohorts would have to be paid, in Panama, for their efforts. During a taped conversation,[5] Takiff expressed concern that

---

[5]Without the knowledge of Kaplan and Gelber, Takiff had begun, in August 1989, to cooperate with the federal government in an attempt to resolve his own criminal problems. Under the direction of law enforcement officials, Takiff began to record his conversations with Kaplan and Gelber. The audio and video tapes (and transcripts of the same) were admitted into evidence at trial.

Arosemena could be killed in the process; and Gelber said that he had relayed this information to Kaplan.

Gelber, Takiff and Kaplan met in person in September 1989 to discuss the plan to obtain the money.[6]  Takiff told Kaplan that soldiers from the Panamanian Defense Force would be sent to Arosemena's office and that the soldiers would force Arosemena to sign cards for the withdrawal of the money.  Takiff warned Kaplan that, although Takiff did not want Arosemena to be injured, Arosemena could be killed.  Kaplan was aware that violence would play a part in the transaction and agreed to the details of the plan.

About the expected proceeds, Takiff initially suggested that the funds be transferred by wire.  Kaplan at one point suggested that he could go to Panama to pick up the money himself.  But ultimately, the coconspirators agreed that Kaplan would accept a check in Florida, payable to a Bahamian lawyer, referenced to an

---

[6]Takiff also tape recorded this meeting pursuant to his agreement to cooperate with the government.

offshore account.  Kaplan was advised that expenses, including Takiff's air travel between the United States and Panama in furtherance of the plot, would be deducted by Takiff from the recovered money.  Takiff and Gelber were to split evenly 40% to 50% of the net proceeds, with the remaining amount going to Kaplan.

As part of the government's process of investigating, Kaplan was informed (untruthfully) that, pursuant to the plan, soldiers did visit Arosemena and that force was used in an effort to obtain access to the money.  The plan, however, was never actually carried out.

Kaplan was indicted for conspiracy to commit extortion in violation of the Hobbs Act, 18 U.S.C. 1951 (Count I), and attempted extortion in violation of the Hobbs Act and the Travel Act, 18 U.S.C. § 1951 and 2 respectively (Count III).[7]  The jury

---

[7]Kaplan was also charged with collection of an extension of credit by extortionate means, in violation of 18 U.S.C. § 894.  The trial court granted him a judgment of acquittal on this charge at the conclusion of all the evidence.

returned a verdict finding Kaplan guilty on both counts.[8]  Kaplan

was sentenced to thirty months incarceration and a $6,000 fine.

Kaplan appealed, arguing, among other things, that the

government had failed to present sufficient evidence of an effect

on commerce under the Hobbs Act.  A panel of this court reversed

his convictions.  United States v. Kaplan, 133 F.3d 826 (11th Cir.),

vacated and reh'g en banc granted, 148 F.3d 1223 (11th Cir.

1998).  The panel believed that the government must prove an

adverse effect on independent, preexisting commerce to satisfy

the Hobbs Act.  Id. at 829, 831.

We granted the government's petition for rehearing en banc

in this Hobbs Act case to decide whether the evidence

established the requisite effect on commerce, including whether

that effect must be adverse to satisfy the Hobbs Act.[9]

---

[8]For Count III, judgment was entered only on the Hobbs Act violation.

[9]Kaplan's other arguments -- about the jury instructions, sentencing, evidence of extortion, and extraterritorial application of the Hobbs Act -- lack merit and are not discussed herein.

Discussion

The Hobbs Act prohibits extortion, and attempts or conspiracies to extort, that "in any way or degree obstruct[], delay[], or affect[] commerce or the movement of any article or commodity in commerce."  18 U.S.C. § 1951(a).[10]  "Commerce" is defined in the Act as "all commerce between any point in a state . . . and any point outside thereof."  18 U.S.C. § 1951(b)(3). Two elements are essential for a Hobbs Act prosecution: extortion and an effect on commerce.  Kaplan, 133 F.3d at 828; § 1951(a). This appeal concentrates on the latter requirement: the effect-on-commerce element.[11]

---

[10]The statute states, in pertinent part: "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both."  § 1951(a).

[11]Kaplan properly preserved this issue for our review by his Rule 29 motions questioning the sufficiency of the evidence.

I.

The Supreme Court has explained that the Hobbs Act contemplates full application of Congress's commerce power: the "Act speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence." Stirone v. United States, 361 U.S. 212, 215 (1960).  And "[w]e have already determined as a matter of law that the impact on commerce does not need to be substantial; all that is required is minimal impact."  United States v. Castleberry, 116 F.3d 1384, 1388 (11ᵗʰ Cir. 1997); see also United States v. Guerra, 164 F.3d 1358, 1361 (11ᵗʰ Cir. 1999) ("[A]n individual defendant's conduct need not substantially affect commerce precisely because the

Hobbs Act regulates general conduct -- robberies and extortion -- which in the aggregate affects commerce substantially.").

The Hobbs Act, by its own terms, encompasses the inchoate offenses of attempt to extort and conspiracy to extort. "Where attempted extortion or conspiracy to extort are charged, the interstate nexus may be demonstrated by evidence of potential impact on interstate commerce, or by evidence of actual, de minimis impact." United States v. Farrell, 877 F.2d 870, 875 (11th Cir. 1989) (citations omitted); see also United States v. DiCarlantonio, 870 F.2d 1058, 1061-62 (6th Cir. 1989) ("While a substantive Hobbs Act violation requires an actual effect on interstate commerce, a conspiracy charge requires the government to prove only that defendants' scheme would have affected commerce."). So, the government need only show a realistic probability of an effect, or some actual de minimis effect, on commerce to bring the extortion within the reach of the Hobbs Act.

Kaplan contends the government failed to bring forth sufficient evidence that the scheme would have produced an effect on commerce. The main question in this case, then, is whether, viewing the evidence in the light most favorable to the government, sufficient evidence was presented to allow a jury to find Kaplan guilty beyond a reasonable doubt. See Castleberry, 116 F.3d at 1387-88.

The government brought forth evidence that, if Kaplan's scheme had succeeded, commerce would have been affected. The conspiracy required at least one transaction between Florida and Panama[12] -- the payment of the extortion demand to Kaplan[13] -- for the conspiracy to be of benefit to the coconspirators. Kaplan sought access to these funds because he had exhausted his

---

[12]Kaplan does not contest the existence of substantial, general commerce between the United States and Panama.

[13]According to Kaplan, once the funds had been obtained from Arosemena, they were to be transferred to Kaplan at an undetermined location in an undetermined manner. But, the government presented sufficient evidence to allow the jury to conclude that Kaplan would receive the money in the form of a check in Florida. And we must, in this appeal, view the facts in the light most favorable to the government, drawing all inferences and credibility choices in favor of the jury's verdict. See Castleberry, 116 F.3d at 1387-88.

11

personal assets, and the coconspirators were to be paid from the money Kaplan received. So, the jury was entitled to find that the movement of substantial funds from Panama to Florida was the object of the coconspirator's extortion plan. See United States v. Eaves, 877 F.2d 943, 946 (11th Cir. 1989) (determining that payment of monies between Georgia and Florida satisfied Hobbs Act's effect-on-commerce element); United States v. Staszcuk, 517 F.2d 53, 56 (7th Cir. 1975) (en banc) (affirming conviction where effect on commerce from the extortion would have been the movement of building materials across state lines); see also United States v. Hollis, 725 F.2d 377, 380 (6th Cir. 1984) (noting that interstate payment of money from which victim was extorted constituted commerce).

Kaplan argues that the transfer of funds to the United States would constitute a later use of the proceeds of the extortion rather than the extortion itself,[14] which Kaplan says was to occur

---

[14]"The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or

wholly within Panama.  But, given the evidence, the jury did not have to find a clean break between the forceful acts and the movement of funds.  For example, the evidence did not demand a finding that there were to be two conspiracies --  one to extort and a different one to transfer funds internationally.  Instead, the jury could view the planned transfer of the money to Florida as evidence that the attempt and conspiracy to extort would have affected commerce within the meaning of the Hobbs Act.  See United States v. Taylor, 966 F.2d 830, 836 (4th Cir. 1992) (finding "no merit to . . . contention that the . . . Hobbs Act require[s] interstate commerce to have been affected by the extortion and not by a result of the extortion"); see also United States v. Blair, 762 F. Supp. 1384, 1389 n.7 (N.D. Ca. 1991) ("An individual may be extorted in a manner which affects interstate commerce if the actual extortionate payment forces the individual to perform a direct interstate transaction.").  In this case, a close and

_____

under color of official right."  § 1951(b)(2).

continuing nexus exists between the acts of coercion and the transmittal of the funds to Florida: the plan would have served no purpose if the money was not ultimately received by Kaplan in Florida.

The government's proof at trial also showed that, within the framework of the plan, Takiff was to travel from Florida to Panama.[15] The plan was orchestrated in the United States to be carried out in another country. So, the different locations of the coconspirators necessitated activity in interstate and foreign commerce to coordinate the scheme. Takiff told Kaplan, at one of their meetings in the United States, that Takiff could set up the plan "with a phone call." During recorded conversations, Takiff offered to contact high ranking individuals in the Panamanian

---

[15]As Kaplan's own brief states, "Takiff made it clear to Kaplan and Gelber that Takiff's presence in Panama was essential to insure that nothing harmful happened to Arosemena."

Defense Force (in Panama) who could retrieve the money from Arosemena in Panama.[16]

Also material to our decision is the government's evidence of an actual effect on commerce. Gelber testified that he often spoke to Takiff on the telephone, while Takiff was in other parts of the country. See United States v. Atcheson, 94 F.3d 1237, 1243 (9th Cir. 1996) ("[Defendants'] placement of out-of-state phone calls [in furtherance of conspiracy to extort] . . . created a further connection with interstate commerce."). And Gelber testified that Takiff often reported that he had traveled to Panama and had been working on Kaplan's problem. "There is nothing in the legislative history of the Hobbs Act that would require an effect on commerce subsequent to, rather than contemporaneous with, the extortion." Hollis, 725 F.2d at 380.

---

[16]Anticipating this proof at trial, Count I of the indictment charged: "It was part of the conspiracy that the defendant would and did contact an individual he believed to have influence with the Panamanian Defense Force ("PDF") for the purpose of employing PDF soldiers to use actual and threatened force, violence and fear to induce Pablo Arosemena to consent to give money to the defendant."

15

Kaplan argues that his conduct, if a crime at all, constitutes a Travel Act[17] violation, and not a Hobbs Act violation. But the use of interstate or foreign transportation and communication facilities to carry out a scheme of robbery or extortion may constitute -- in conjunction with other facts -- a sufficient effect upon commerce for a Hobbs Act conviction for conspiracy or attempt to extort. See Atcheson, 94 F.3d at 1243 ("To support . . . conviction of conspiracy [to violate the Hobbs Act], the Government need only show that the totality of [the coconspirators'] actions had a de minimis effect on interstate commerce."). And, the same conduct may violate more than one statute.[18] See, e.g., Missouri v. Hunter, 459 U.S. 359, 366-68

---

[17]The Travel Act proscribes the "travel[] in interstate or foreign commerce or [use of] the mail or any facility in interstate or foreign commerce, with intent to –
   (1) distribute the proceeds of any unlawful activity; or
   (2) commit any crime of violence to further any unlawful activity; or
   (3) otherwise promote, manage, establish, [or] carry on . . . any
      unlawful activity,"
and thereafter performs or attempts to perform one of the foregoing acts. 18 U.S.C. § 1952.

[18]But judgment was not entered against Kaplan on the Travel Act violation.

16

(1983) (noting, in context of double jeopardy analysis, that multiple statutes may proscribe the same conduct).

In this case, the potential effects, combined with the evidence of actual effects, are sufficient to establish the minimal effect on commerce required under the Hobbs Act.

II.

Having determined that the conduct of Kaplan and his coconspirators did and would affect commerce, we must next decide whether that effect must be adverse to satisfy the Hobbs Act.  The panel believed that it was bound by United States v. De Parias, 805 F.2d 1447 (11th Cir. 1986), to require an adverse effect on commerce under the Hobbs Act.  See Kaplan, 133 F.3d at 831.  The De Parias opinion says at one point that one of the requirements of the Hobbs Act is that the "coercion occur[] in such a way as to affect adversely interstate commerce."  Id. at 1450

(emphasis added). We question whether the statement in the <u>De Parias</u> opinion was indeed binding.[19] But, even if it was, to the extent that <u>De Parias</u> required an adverse effect, we now overrule it.

The Hobbs Act punishes "whoever <u>in any way</u> or degree . . . affects commerce . . . by robbery or extortion." § 1951(a) (emphasis added). "These words do not lend themselves to restrictive interpretation." <u>United States v. Culbert</u>, 435 U.S. 371, 373 (1978). No modifier of the verb "affect" is in the plain language of the statute. <u>See</u> <u>McNely v. Ocala Star-Banner Corp.</u>, 99 F.3d 1068, 1073 (11th Cir. 1996) ("'We must give effect to this plain language unless there is good reason to believe Congress intended the language to have some more restrictive meaning.'") (quoting <u>Shaw v. Delta Air Lines, Inc.</u>, 463 U.S. 85, 97 (1983)).

---

[19]Neither <u>De Parias</u> nor the cases it cites directly presented the question now before us: whether only adverse effects matter under the Hobbs Act. And, other than the initial statement quoted above, <u>De Parias</u> speaks more generally of "an effect on interstate commerce," "a connection with interstate commerce," or "a nexus with interstate commerce." <u>De Parias</u>, 805 F.2d at 1450, 1451. The panel may have drawn the holding of <u>De Parias</u> too broadly.

The Act's language is broad, and it is evidence that Congress intended to protect commerce from any and all forms of effects, whether they are direct or indirect, actual or potential, beneficial or adverse.[20]  For courts to require the effect on commerce to be adverse would significantly narrow the statute.  See Culbert, 435 U.S. at 380 ("Our examination of the statutory language and the legislative history of the Hobbs Act impels us to the conclusion that Congress intended to make criminal all conduct within the reach of the statutory language.").

Other courts have refused to engraft the word "adversely" onto the plain statutory language.  See United States v. Bailey, 990 F.2d 119, 126 (4th Cir. 1993) ("Although the word 'adverse' has been loosely used in expressing the effect on interstate commerce, such adverse effect is not an essential element of the

---

[20]Consideration of decisions arising under other statutes with similar language may inform our opinions sometimes.  But, today's decision rests directly on the facts of this case and the language of this statute.  To the extent that decisions applying other statutes may differ, that difference seems to result from different facts, different statutory language, different legislative history, different precedents or some combination of these things.  We think these differences render comparisons to today's decision unhelpful.

crime that must be proved by the prosecution in a Hobbs Act case."); see also United States v. Tormos-Vega, 959 F.2d 1103, 1113 (1st Cir. 1992) (stating that beneficial effect is sufficient); United States v. Mattson, 671 F.2d 1020, 1024 (7th Cir. 1982) ("Even a beneficial effect . . . is within the prohibition of the statute."). Although Kaplan has not pointed to cases from other circuits, we recognize that some other circuits have written that an adverse effect is an element of a Hobbs Act case. See McLaughlin v. Anderson, 962 F.2d 187, 194 (2d Cir. 1992); United States v. Snyder, 930 F.2d 1090, 1093 (5th Cir. 1991). But, we are unpersuaded by the adverse-effects language in the McLaughlin and Snyder opinions.[21] Furthermore, like De Parias, neither of those cases directly presented the question of whether only an adverse effect on commerce will do; and neither opinion applies an only-adverse-effects-matter requirement to decide the case then before the court.

---

[21]We do stress that the scope of the Hobbs Act is not unlimited. But, we, as judges, cannot rewrite the statute to add the term "adverse."

Because we have determined that the effect on commerce under the Hobbs Act need not be adverse, it is unnecessary for us to characterize the effect on commerce in this case.[22] Potential and actual effects exist in this case, and that is all the Act requires.

We see the federalism concerns involved in this case. We do not wish to expand federal criminal jurisdiction to contexts that the states are best positioned to address. And we stress that the statutory language requires the prosecutor to prove a definite connection with commerce in every Hobbs Act case. But the Hobbs Act -- as Congress has written it and, therefore, as we must apply it -- has a broad reach. Our duty is to apply the law, as we understand it is, to the facts before us. And an examination of the facts of this case, given the overall circumstances, shows

---

[22]We note, however, that the jury instructions required a finding that the extortion attempt "would have delayed, interrupted or adversely affected interstate commerce."

21

sufficient evidence to allow a jury to conclude properly that an effect on commerce exists.[23]

Based on our review of the record, sufficient evidence was presented to support the jury's finding that Kaplan was guilty of crimes covered by the Hobbs Act. Sufficient evidence shows that Kaplan's attempt and conspiracy to extort would have had and did have at least a minimal effect on commerce. Therefore, Kaplan's convictions are AFFIRMED.

AFFIRMED.

BIRCH, Circuit Judge, dissenting, in which TJOFLAT, ANDERSON and BARKETT, Circuit Judges, join:

---

[23]Several theories on how the effect-on-commerce element may be established generally have been advanced by the government in this case. But, the language of the statute governs our result. We announce no sweeping theories today. The effect-on-commerce question requires a fact-specific inquiry, see Staszcuk, 517 F.2d at 58 (stating that enforcement of Hobbs Act necessarily proceeds on a case-by-case basis); and we base our decision on the particular facts with which we are presented.

I respectfully dissent. The majority's holding will result in the federalization of any crime involving extortion to acquire money. Plainly stated, "[t]his is a case about federalism."[1] If we were to accept the government's position on this issue, the Hobbs Act would completely subsume state extortion and robbery laws by creating a federal criminal offense in each and every case in which the pay-off is at all likely to cross state lines. Surely, Congress cannot have intended any such result.

The plain and unambiguous language of the statute draws a distinction between extortion that <u>affects</u> commerce and extortion that <u>constitutes</u> or <u>produces</u> commerce.[2] Although Congress has the power to

---

[1]The phrase belongs to Justice O'Connor, <u>see</u> <u>Coleman v. Thompson</u>, 501 U.S. 722, 726, 111 S. Ct. 2546, 2552, 115 L. Ed. 2d 640 (1991), but a recent decision of our own court (which found federal jurisdiction under the Hobbs Act) raised the same concerns and cautioned against interpreting the Act in a manner that would "obliterate the distinction between what is national and what is local and create a completely centralized government." <u>United States v. Paredes</u>, 139 F.3d 840, 844 (11th Cir.), <u>cert.</u> <u>denied</u>, ___ U.S. ___, 119 S.Ct. 572 (1998)(quoting <u>United States v. Lopez</u>, 514 U.S. 549, 557, 115 S. Ct. 1624, 1628-29, 131 L. Ed. 2d 626 (1995)).

[2]Two cases arising under the robbery prong of the Hobbs Act may help demonstrate this distinction in cases involving individual victims. In <u>United States v. Flores</u>, 855 F. Supp. 638 (S.D.N.Y. 1994), the defendant had assaulted two victims as they entered their apartment and robbed them of $4000. After noting the defendant's characterization of the event as a "garden variety" robbery, the court found an *affect on commerce* because the money represented the proceeds of the victims' flower business and was to have been deposited in a business account. By contrast, in <u>United States v. Quigley</u>, 53 F.3d 909, 910 (8th Cir. 1995), the defendants spotted their victims walking along the road at night, offered them a ride, and proceeded to rob them of all they had: "eighty cents and a near-empty pouch of chewing tobacco." The government unsuccessfully advanced a number of theories to provide the required effect on commerce, including the fact

23

criminalize both types of extortion, the Hobbs Act addresses only the former.

The most convincing argument that the majority's sweeping interpretation must be wrong is the fact that the government and the courts have undertaken what is often a searching inquiry to find how the crime in question affected the victim's ability to conduct business. More specifically, in all the extortion cases available for examination, the courts have searched for some such effect on commerce even though <u>money, the most common form of extortion proceeds, is uniquely likely to enter interstate commerce</u>. If establishing jurisdiction under the Hobbs Act were as easy as showing a likelihood that the proceeds would travel in interstate commerce, surely the government and the courts historically would not have gone to the effort to establish alternative (and often tenuous) connections to commerce.

Finally, I note that in a similar line of authority that has developed in the case law applying the analogous language of the federal arson statute we have taken a different tack. That statute criminalizes the destruction of "any building, vehicle, or other real or personal property used in interstate

---

that the victims were in the process of procuring beer. The court, however, did not discuss the fact that the defendants could have moved or spent their ill-gotten gains in interstate commerce and concluded that the government had not established federal jurisdiction.

24

or foreign commerce or in any activity *affecting interstate or foreign commerce . . . .*"  18 U.S.C. § 844(i) (emphasis added).  In <u>Russell v. United States</u>, 471 U.S. 858, 105 S. Ct. 2455, 85 L. Ed. 2d 829 (1985), the Supreme Court held that the statute required the targeted property to have some connection to business: "In sum, the legislative history suggests that Congress at least intended to protect all business property, as well as some additional property that might not fit that description [namely police stations and churches], but perhaps not every private home."  <u>Id.</u> at 862, 105 S.Ct. at 2457.  In applying section 844(i) we have gone to lengths to connect the destroyed property with interstate commerce and have held the line against making every act of arson a federal crime.  <u>Compare</u> <u>United States v. Grimes</u>, 142 F.3d 1342 (11th Cir. 1998), <u>cert.</u> <u>denied</u>, ___ U.S. ___, 119 S.Ct. 840 (1999) (finding jurisdiction over arson involving commercial rental properties) <u>with</u> <u>United States v. Denalli</u>, 73 F.3d 328 (11th Cir.) (per curiam), <u>modified</u> by 90 F.3d 444 (11th Cir. 1996) (per curiam) (no jurisdiction under section 844(i) for arson involving a private residence).  Since we have taken the required connection to commerce seriously in the section 844(i) context, it is inconsistent for us to further dilute the jurisdictional requirement under the Hobbs Act . . . and that is what the

majority opinion accomplishes today. The heretofore clearly marked channel of the stream of commerce has been muddied which will likely result in a flood of former state extortion cases into the already drowning federal court system.