**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Peter R. FARRELL and Paul A.
Farrell, Defendants–Appellants.**

**No. 87–5500.**

United States Court of Appeals,
Eleventh Circuit.

July 17, 1989.

Theodore J. Sakowitz, Federal Public Defender, Kenneth M. Swartz, Asst. Federal Public Defender, Miami, Fla., for defendants-appellants.

Theresa Van Vliet, Linda C. Hertz, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before RONEY, Chief Judge,
VANCE, Circuit Judge, and EVANS *,
District Judge.

ORINDA D. EVANS, District Judge:

Defendants Peter Farrell and Paul Farrell appeal their convictions for conspiracy to extort and attempted extortion in violation of the Hobbs Act, 18 U.S.C. § 1951.

FACTS

On Tuesday, September 16, 1986, Community School in Naples, Florida, received a telephone call from an individual who identified himself as James Logan. Logan stated that pursuant to the instructions of his employer John Mueller, he would be coming to the school at about 1:30 p.m. to pick up nine-year old Amanda Mueller for a dental appointment. At approximately 1:30 p.m., Defendant Peter Farrell, wearing a blond wig and representing himself to be "James Logan," arrived. He presented a typewritten letter on Mueller Company stationery. The letter bore the apparent signature of John Mueller and requested that Amanda be excused for her appointment. Amanda, who was seated in the waiting area outside the principal's office, was told to go with "Mr. Logan." Prior to Peter Farrell's arrival, the school premises had been surveilled by Defendant Paul Farrell, who was posing as a telephone repair man. Paul Farrell is Peter Farrell's brother.

Amanda got into Peter Farrell's automobile; he snapped a Polaroid photo of her and took it to Paul Farrell, who by then was waiting nearby in another automobile.

Peter Farrell's vehicle had been rented for the occasion by Edward O'Brien, an associate of the Farrells.

Peter Farrell drove Amanda to a condominium he had rented for that week. He gave her a pill which he said was for her "cavities." Peter Farrell then left and Paul Farrell remained with Amanda. He had a .380 Baretta pistol which he displayed in Amanda's presence. At one point, Paul Farrell left, and Amanda was kept in the bathroom until he returned, approximately twenty-four hours later.

Shortly after Amanda had been taken from the school, an official of Naples Federal Savings and Loan received a telephone call from John Mueller.[1] As a result of this call, the official immediately contacted the county sheriff's office and the FBI. She also looked under the sink in one of the bank's restrooms. She found an envelope which had contained the Polaroid photograph of Amanda, plus a ransom note. The photograph was later found to contain the fingerprints of both Peter and Paul Farrell; Paul Farrell's prints were also on the ransom note. The note stated:

Your daughter has been kidnapped. Follow instructions and she will be returned unharmed in a few days. You are being watched. Any law officials news reports or investigations or failure to deliver full amount of money will cause her instant death because of your stupidity. There will be no negociating [sic] on anything. 1,540,000.00 will be delivered by Friday afternoon —see attached card for breakdown of denominations.

She has been heavily sedated since her pick-up. She knows nothing of what has happen [sic] so far. An Insurance Policy, thanks to Polaroid films has been immediately taken out. She has no knowledge of this. But in the future if any investigation is identified your daughter will become the most celebrated good girl since Maryln [sic] Chambers

---

* Honorable Orinda D. Evans, U.S. District Judge for the Northern District of Georgia, sitting by designation.

1. John Mueller did not testify at trial. There was no evidence of what event prompted Mueller to call the bank.

[sic] face left Ivory Snow and turn [sic] up giving head on public view. Remember Insurance Policy does'nt [sic] go into effect until there is an accident. Don't cause any accidents! Her shame would ruin her for the rest of her life. Don't Fuck Up! Get your ass moving without causing outside alarm—Money time— and quickly.

Your first test for her life is to bring this note outside the door 30 ft. from you—west side of bank—stop at lamp-post and light it—hold till fully burned— some one is watching inside John right now—Don't Fuck up—1st time and she's dead. Save cash denomination card. And instructions for money drop taped to bottom of mail-box at Sears outside pick-up FRIDAY at 3:00 P.M.! have money— car an no tails or homing device—They are really easy to spot. Don't forget people who know money can spot marked money—consecutive numbers ink that runs erasing corners, dusted, black light-view—Blue + red threads —etc. It will be all checked thoroughly before release.

Call school to say she won't be in the rest of the week. Ask nothing else of personel [sic] at school. Yes someone will be listening. If any instructions are not followed completely you will really hate seeing mail delivery.

Good luck No heroes—have a happy ending—now Burn this!!

Later that evening John Mueller met with Special Agent Thomas Diehl at the Naples, Florida FBI office. Mueller left the FBI office slightly after midnight, and drove to the Sears mailbox referenced in the ransom note. FBI agent Ronald Foster watched him as he removed a paper from the bottom of the mailbox, read it, and ran back to his Cadillac. Agent Foster followed Mueller as he returned to the Naples FBI office where they met Agent Diehl. The note Mueller gave Diehl read:

GO TO EXIT SIGN 20 ON I-75 NORTH RED CUP ON GROUND NEAR POLE!!

In the early morning hours of September 17, two FBI agents drove to exit 20 and found a note and a transmitter inside a McDonald's paper cup. They copied the note, which said:

Don't Say A Word
You have hear [sic] a transmitter Tap it 2 times to give test signal that it works. Everything you now say can be heard with [sic] a 5 mile range. Put it in shirt pocket. Go to marker exit 21 bottom of sign post west side—Red Flag says you can be heard AND ARE Following directions. No Red Flag means deal is dead—go home AND Cry. Rip this up and throw it now 8 pieces—Watching IF RED FLAg is there, 2nd directions at base of EXIT 21 sign Near REd FLAg Change Cars at airport—Get Lincoln at A Hertz–Avis–National. Leave your car in [illegible] Parking—Short term—

The agents placed the note, the transmitter and the cup back in their original positions. They then drove on to locate the marker at Exit 21 and the directions which were supposed to be at the base of the exit sign. They found a red-orange ribbon wrapped around a post at Exit 21, but did not find any directions.[2]

On Wednesday, September 17, 1986, John and Barbara Mueller executed a note payable to Naples Federal Savings and Loan Association in the principal sum of $1,540,000. The note called for periodic interest payments, with the principal falling due on September 17, 1989. The note contained the following provision:

THIS NOTE EVIDENCES A CONTINGENT INDEBTEDNESS FOR FUNDS ADVANCED AND SURRENDERED BY NAPLES FEDERAL SAVINGS AND LOAN ASSOCIATION BY REASON OF AN EXTORTION DEMAND MADE ON THE ABOVE REFERENCED JOHN P. MUELLER AND BARBARA B. MUELLER BY PARTY OR PARTIES UNKNOWN AND TO THE EXTENT ANY LOSS IS SUSTAINED BY NAPLES FEDERAL SAV-

---

**2.** A note and map, which apparently constituted the "directions" referred to in the previous note were found near the Exit 21 sign after Amanda's rescue. The note was contained in a paper cup which had been painted red and placed into the ground upside down. This note directed that the ransom money should be left at a site near Exit 26 on I-75, next to a four foot colored pole.

INGS AND LOAN ASSOCIATION BY REASON OF THE EXTORTION WHICH IS NOT RECOVERABLE UNDER THAT CERTAIN THE FIDELITY AND DEPOSIT COMPANY OF MARYLAND INSURANCE POLICY NO. 60 74 903–A, INCLUDING RIDERS RELATED THERETO, THIS NOTE SHALL EVIDENCE SAID INDEBTEDNESS TO THE EXTENT NOT RECOVERABLE UNDER THE AFORESAID POLICY OF INSURANCE.

The note was secured by the Muellers' home, plus 30,000 shares of stock in NAFCO Financial Group, Inc. NAFCO Financial Group, Inc. is a publicly held Delaware corporation, whose stock is traded on the New York Stock Exchange. Naples Federal Savings and Loan and the Mueller Company are wholly owned subsidiaries of NAFCO Financial Group. John and Barbara Mueller are officers of the Mueller Company. The stock pledge agreement granted a security interest in the NAFCO shares to the bank, and acknowledged that the bank had physical possession of the stock certificates. The pledge agreement granted the bank the right to sell the stock if the loan was not paid at maturity.

In the pre-dawn hours of Friday, September 19, Paul Farrell left the condominium with Amanda tied up in the back seat of his car. He drove her to a wooded area outside Naples where he placed her in a large cardboard box, along with some food. The box was taped shut, but had an air hole in it. It had been painted black. Farrell warned Amanda not to get out of the box, and told her that she was being watched. He then left the site and traveled to Jacksonville, Florida, for his wedding.

That afternoon, John Mueller went to Naples Federal Savings and Loan approximately one hour before the designated drop off time for the ransom money.[3] Leaving the bank, he got in his car and retraced the steps outlined in the various notes which had been recovered, beginning with the Sears mailbox site. After Exit 21, he proceeded to the airport where he left his

Cadillac in a parking lot. He got into a silver Lincoln and drove away.

According to Edward O'Brien's testimony, he spent several hours waiting at a site near Exit 26 pursuant to directions received from Peter Farrell. When nothing had materialized by early evening, he called Peter Farrell in Jacksonville, Florida and told him the money had not been delivered. Peter Farrell was in Jacksonville for Paul Farrell's wedding. According to Peter Farrell's trial testimony, while O'Brien was on the line speaking with him, he heard a loud noise, leading Farrell to believe that perhaps O'Brien had been shot.

Sometime that same Friday evening, Reverend Harold Brown in Naples received a long distance telephone call from Peter Farrell. Farrell asked if there had been anything in the news about a shootout. He also asked if Brown had heard anything about a kidnapping. Brown replied that he had not. Then Farrell gave Brown instructions as to how Brown might find a child in a black box in a wooded area. He also asked Brown to call John Mueller. Reverend Brown contacted law enforcement authorities and related this information. An intensive search of the wooded area early Saturday morning yielded the discovery of Amanda, alive in the black box.

A letter written by Paul Farrell to his brother-in-law after his arrest stated, "The little girl was supposed to have died the night of the 19th. That is one of the things I couldn't do."

On September 30, 1986, a grand jury indicted both the Farrells and Edward O'Brien for conspiracy to extort and attempted extortion in violation of the Hobbs Act. The Farrell brothers admitted taking Amanda from school, holding her hostage, and leaving her in the black box in the woods. However, they denied that this was related to an attempt to extort money from John Mueller.

Peter Farrell testified that he had abducted Amanda in response to a request by John Mueller. He said Mueller told him he needed to have twenty-four hours alone

---

3. The record contains no express evidence of what occurred inside the bank.

with his wife in order to "motivate" her to leave because he could not divorce her for financial reasons. In return, Mueller allegedly had agreed to keep Naples Federal Savings and Loan from foreclosing on some of Farrell's property. Farrell said that the idea for ransom money was a ruse by Mueller to transfer funds outside his wife's control.

Paul Farrell testified that Peter told him John Mueller wanted Amanda picked up from school and held for a few days. Paul Farrell admitted he delivered an envelope. He said he had fingered the paper inside the envelope but had not looked at it. He stated he added the Polaroid photo. Regarding the reference in the letter to the planned death of Amanda, Farrell explained that an individual named "Dave" had met him and Amanda at the wooded site and identified himself as an employee of John Mueller's. "Dave" allegedly told Farrell to go ahead and "pop her" but Farrell testified that he had refused to do this.

Edward O'Brien testified that he knew nothing of the kidnapping scheme. He stated that Peter Farrell had asked him to rent two automobiles, and to pick up some money at the Exit 26 site on September 19. O'Brien said Farrell had told him the money was related to a liquidation of Farrell's assets.

On April 10, 1987, a jury found the Farrells guilty of conspiracy to extort and attempted extortion in violation of the Hobbs Act. 18 U.S.C. § 1951.[4] It acquitted O'Brien. Each of the Farrells received twenty years on count one and twenty years on count two, to run consecutive to each other.

JURISDICTION

The Farrells argue that the conspiracy and attempt to extort did not constitute violations of the Hobbs Act because the kidnapping, the ransom demand, and the bank loan were entirely intrastate matters.

 The Hobbs Act applies to extortion wherein the perpetrator "... *in any way or degree* obstructs, delays or affects commerce or the movement of any article or commodity in commerce...." 18 U.S.C. § 1951(a) (emphasis supplied). Only a de minimis nexus with interstate commerce is required. *United States v. Jackson,* 748 F.2d 1535 (11th Cir.1984). Where attempted extortion or conspiracy to extort are charged, the interstate nexus may be demonstrated by evidence of potential impact on interstate commerce, *see United States v. Gupton,* 495 F.2d 550 (5th Cir.1974), or by evidence of actual, de minimis impact, *see United States v. Alexander,* 850 F.2d 1500 (11th Cir.1988), *cert. denied sub nom. Grider v. United States,* —— U.S. ——, 109 S.Ct. 1346, 103 L.Ed.2d 814 (1989). Potential impact is measured at the time of the attempt, *i.e.,* when the extortion demand is made, based on the assumed success of the intended scheme. *See United States v. Anderson,* 809 F.2d 1281 (7th Cir.1987); *United States v. Rindone,* 631 F.2d 491 (7th Cir.1980). A sufficient potential impact exists when there is evidence of "a plan to embark upon a course of extortionate behavior likely to have the natural effect of obstructing commerce." *Gupton,* 495 F.2d at 551.

 Had the Farrells' extortion scheme succeeded, the likely natural effect was that interstate commerce would have been affected. In the first place, it is inferable that there would have been a claim made against the Fidelity and Deposit Company of Maryland by Naples Federal Savings and Loan Association. Either the denial of the claim or payment thereof necessarily would implicate interstate commerce to some degree. Secondly, the sheer size of the extortion demand implies that the utilization of the funds by the Farrells would

---

4. This section states:
 **Interference with commerce by threats or violence**
 (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or at-
 tempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

have affected interstate commerce to a legally cognizable degree.

Finally, the Muellers' pledge of the NAFCO shares to the bank represented an actual obstruction of their right to freely trade the shares on the New York Stock Exchange. Thus, the Defendants' jurisdictional argument fails.

## SUFFICIENCY OF THE EVIDENCE

Defendants contend that the evidence is insufficient to support their convictions. They argue that because John Mueller failed to testify at trial, there was no evidence that any actions of Mueller were induced by actual or threatened force, violence or fear.[5]

■ Defendants fail to distinguish between the elements of extortion and the elements of the crimes the jury found they committed. Attempted extortion under the Hobbs Act requires proof of intended extortion through acts reasonably calculated to arouse fear. No proof of actual inducement is required. *See United States v. Nadaline*, 471 F.2d 340, 344 (5th Cir.1973), *cert. denied*, 411 U.S. 951, 93 S.Ct. 1924, 36 L.Ed.2d 414 (1973); *see also United States v. Quinn*, 514 F.2d 1250 (5th Cir.1975), *cert. denied*, 424 U.S. 955, 96 S.Ct. 1430, 47 L.Ed.2d 361 (1976). The essence of conspiracy to extort is the agreement to extort. *See Nadaline* at 344. The evidence showed that Peter and Paul Farrell agreed upon and implemented a plan which included the abduction of Amanda Mueller and the delivery of an extortion note to Naples Federal Savings and Loan Association. The extortion note and the kidnapping were both reasonably calculated to arouse fear. Further, the note states that it is intended to induce the payment of $1,540,000 in ransom money. The inclusion of the Polaroid photograph in the envelope with the note is evidence that the Muellers were the intended recipients of the note, as is the reference in the note to "John." That John Mueller received the note, or was informed of its contents, is evidenced by the fact that he executed a note for the exact amount of the ransom demand one day after it was sent and followed the directions in the various notes in an apparent effort to deliver the ransom money. While the Farrells denied that their true intent was to induce a ransom payment, the jury was free to assess their credibility and to reject their testimony. A reasonable trier of fact could have found that the evidence proved the Farrells guilty of the crimes charged beyond a reasonable doubt; therefore, the evidence is sufficient to sustain the verdict. *United States v. Blanton*, 793 F.2d 1553, 1557 (11th Cir.), *cert. denied sub nom. Banks v. United States*, 479 U.S. 1021, 107 S.Ct. 678, 93 L.Ed.2d 728 (1986).

## SEVERANCE

The Farrells urge that the trial court erred in refusing to sever the government's case against Co-defendant O'Brien. As noted, O'Brien argued that the Farrells masterminded the kidnapping scheme and he was an unknowing participant. The trial court based its ruling on a determination that O'Brien's defense of being the Farrells' dupe and the Farrells' defense that Mueller instigated the kidnapping and asked them to participate were not mutually exclusive.

■ A refusal to sever defendants' trials should not be overturned absent an abuse of discretion. *United States v. Berkowitz*, 662 F.2d 1127, 1134 (5th Cir.1981). To prove abuse of discretion Defendants must show they received an unfair trial and "suffered compelling prejudice against which the trial court was unable to afford protection." *Id.* at 1132. With proof that the various defenses in this case were "antagonistic to the point of being irreconcilable and mutually exclusive," Defendants can meet this burden. *United States v. Romanello*, 726 F.2d 173, 177 (5th Cir.1984). Specifically, "[t]he essence or core of the defenses must be in conflict, such that the jury, in order to believe the core of one

---

**5.** The Hobbs Act provides in § 1951(b)(2):

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

defense, must necessarily disbelieve the core of the other." *Id.*

 The defenses offered at trial were not mutually exclusive and antagonistic. *United States v. Gonzalez,* 804 F.2d 691, 695 (11th Cir.1986). The jury did not have to disbelieve O'Brien's claim that he was duped by the Farrells in order to believe that Mueller arranged the kidnapping. *United States v. Berkowitz,* 662 F.2d at 1134. The defense of lack of knowledge need not "preempt" the defense of lack of intent. *See United States v. Swanson,* 572 F.2d 523, 529 (5th Cir.), *cert. denied,* 439 U.S. 849, 99 S.Ct. 152, 58 L.Ed.2d 152 (1978). The trial court did not abuse its discretion in refusing to sever.

## HEARSAY

Defendants claim the trial court erred in admitting certain hearsay evidence. They argue that it was error to admit FBI Agent Williamson's testimony that he had received certain items from John Mueller "... after [Mueller] returned home from one of his forays that he had been sent on by the alleged kidnappers." Also, they claim it was error to admit into evidence that portion of the $1,540,000 note which states that the note evidences indebtedness for "funds advanced and surrendered by Naples Federal Savings and Loan Association by reason of an extortion demand made on the above-referenced John P. Mueller and Barbara B. Mueller by party or parties unknown...." However, there was no contemporaneous hearsay objection in either case.[6] Accordingly, these claims may be reviewed only under a plain error standard. Fed.R.Crim.P. 52(b); Fed.R. Evid. 103(a)(1) and (d); *see United States v. Edwards,* 696 F.2d 1277, 1281–82 (11th Cir.), *cert. denied,* 461 U.S. 909, 103 S.Ct. 1884, 76 L.Ed.2d 813 (1983). The admission of this evidence was not plain error, as it

did not seriously impact the fairness of the trial.

Defendants also contend that testimony by FBI Agents Foster and Ramirez identifying John Mueller as the person they had seen driving to the various locations indicated in the notes was inadmissible hearsay. Admission of this identification testimony, assuming that it was hearsay, was harmless because Mueller's identity as the subject of the surveillance was clearly established by the testimony of Agent Diehl. *See United States v. Glasser,* 773 F.2d 1553, 1561 (11th Cir.1985).

Accordingly, the convictions are AF-FIRMED.

---

6. Defense counsel did object to Agent Williamson's testimony, but the objection was vague. Counsel stated, "Your Honor, again objection. We don't need to go into the reasons again. I move for another instruction also." However, the immediately preceding objection pertained to the prejudicial effect of photographs taken of

Amanda when she was removed from the black box, not hearsay. The $1,540,000 note was admitted into evidence without objection during the government's case in chief. The hearsay objection was raised for the first time during the charge conference.