UNITED STATES of America, Plaintiff-Appellee,

v.

Nghia LE, a.k.a. Vince Le, Defendant-Appellant.

No. 00-11124.

United States Court of Appeals,

Eleventh Circuit.

July 11, 2001.

Appeal from the United States District Court for the Northern District of Florida. (No. 99-00023-CR-4-RH), Robert L. Hinkle, Judge.

Before HULL, RONEY and GOODWIN[*], Circuit Judges.

GOODWIN, Circuit Judge:

Nghia Le ("Le") got the idea that a Tallahassee business man kept a large supply of cash from his two nail salons at his house. He decided to employ a small band of rent-a-robbers to fly from Los Angeles, California to Tallahassee, Florida to perform a home invasion robbery. After the robbery went awry, the mercenaries talked, and Le was indicted and convicted under the Hobbs Act and for use of a firearm in connection with these crimes. He now appeals his convictions and his sentence on a variety of grounds.

The principal question before us is whether this is a federal case. We conclude that Le's actions had both potential effects and actual, de minimis effects on interstate commerce, and that the Government thus had jurisdiction to prosecute Le under the Hobbs Act. In addition, we find that the district court did not err by admitting into evidence Le's post-arrest statements and the transcripts of certain foreign-language telephone conversations. Regarding Le's sentence, we conclude that the district court properly applied a two-level car-jacking increase to his base offense level but erred in applying a seven-level firearm increase.

BACKGROUND

Kenny Nguyen ("Nguyen") and his wife owned and operated two nail salons in two separate shopping malls in Tallahassee, Florida. They ordered their manicure supplies from Georgia, spending between five and seven thousand dollars a year. At the end of each business day the Nguyens took that day's business receipts to their house. They deposited their business proceeds at a bank approximately once a week.

Le, who had been observing the apparent prosperity of the Nguyens, concluded that they likely kept

---

[*]Honorable Alfred T. Goodwin, U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

substantial sums of cash from their businesses in their residence. Not wishing to perform the robbery himself, and apparently unable to enlist suitable confederates in Tallahassee, Le telephoned acquaintances in California and recruited five of them. One of these co-conspirators testified at trial that Le "told us he knew a guy that was living in Tallahassee that had a house and that he had at least a hundred to two hundred thousand dollars in cash."

Le's acquaintances traveled from California to Florida for the planned robbery. Le organized the crime, provided temporary housing for the robbers, furnished one or more weapons, and pointed out the target house. For his efforts, Le was to receive ten percent of the proceeds. The night of the robbery, he remained well away from the execution of the plan.

The five rent-a-robbers entered the Nguyens' house, bound several of the occupants, and conducted an unsuccessful search for the promised cash. Meanwhile, Nguyen, after hearing the commotion, fled the residence with that day's business receipts, which amounted to between six and eight thousand dollars. The Californians later left the house and drove away in a car belonging to Mrs. Nguyen, the only other fruit of their labors being a stolen wristwatch. They soon thereafter abandoned the car and fled in the car of one of the co-conspirators. The five Californians were arrested the next morning. Two weeks after the robbery, Nguyen sold his manicure business. He subsequently reopened the nail salons in two new locations.

Following a lengthy investigation, Le was indicted on three counts: 1) conspiring to obstruct interstate commerce by robbery, in violation of the Hobbs Act, 18 U.S.C. §§ 1951 and 1952; 2) obstructing interstate commerce, and attempting to do so, by robbery, in violation of the Hobbs Act, 18 U.S.C. §§ 1951 and 1952; and 3) using or carrying a firearm while obstructing interstate commerce or attempting to do so, in violation of 18 U.S.C. § 924(c).[1]

A jury found Le guilty on all three counts. The district court sentenced Le to a custodial sentence of 322 months—consisting of consecutive sentences of 240 months for Count One, 22 months for Count Two, and 60 months for Count Three—together with three years of supervised release and an order of restitution.

DISCUSSION

I.      *Jurisdiction Under the Hobbs Act*

---

[1]Count Two of the indictment included both obstruction of interstate commerce and the lesser included offense of attempt to obstruct interstate commerce, charging that Le "did knowingly, willfully and unlawfully obstruct, delay and affect interstate and foreign commerce, and the movement of articles and commodities in such commerce, and attempt to do so, by robbery ...."

Le's primary contention concerning his convictions on Counts One and Two is that the Government lacked jurisdiction to prosecute him under the Hobbs Act because it failed to prove that his actions bore a sufficient connection to interstate commerce. This Court reviews *de novo* a challenge to the sufficiency of the evidence concerning whether a robbery had a sufficient effect on interstate commerce to support a conviction under the Hobbs Act. *See United States v. Guerra,* 164 F.3d 1358, 1359 (11th Cir.1999) (citing *United States v. Keller,* 916 F.2d 628, 632 (11th Cir.1990)). "[W]e consider that evidence in the light most favorable to the government, drawing all inferences and credibility choices in favor of the jury's verdict." *Id.* (citing *United States v. Adair,* 951 F.2d 316, 318 (11th Cir.1992)).

The Hobbs Act provides in relevant part, "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both." 18 U.S.C. § 1951(a). "Commerce" is defined as including "all commerce between any point in a State ... and any point outside thereof." 18 U.S.C. § 1951(b)(3). The Supreme Court has stated that in a prosecution under the Hobbs Act, "[t]he charge that interstate commerce is affected is critical since the Federal Government's jurisdiction of this crime rests only on that interference." *Stirone v. United States,* 361 U.S. 212, 218, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).

This circuit's precedent makes clear that the type of evidence required for the Government to satisfy its burden of proof concerning the interstate commerce nexus differs depending on whether the defendant is charged with the inchoate offenses of conspiracy and attempt or a substantive offense under the Hobbs Act. In the case of a substantive Hobbs Act offense, the "impact on commerce does not need to be substantial; all that is required is minimal impact." *United States v. Kaplan,* 171 F.3d 1351, 1354 (11th Cir.) (quoting *United States v. Castleberry,* 116 F.3d 1384, 1388 (11th Cir.1997)) (*en banc*), *cert. denied,* 528 U.S. 928, 120 S.Ct. 323, 145 L.Ed.2d 252 (1999). *See also United States v. Diaz,* 248 F.3d 1065, 1084 (11th Cir.2001). Where a defendant is charged with attempt or conspiracy to violate the Hobbs Act, "the interstate nexus may be demonstrated by evidence of *potential impact* on interstate commerce *or* by evidence of actual, de minimis impact." *Kaplan,* 171 F.3d at 1354 (quoting *United States v. Farrell,* 877 F.2d 870, 875 (11th Cir.1989))

(emphasis added);  *Diaz,* 248 F.3d at 1084 (quoting *Farrell,* 877 F.2d at 875).[2]

This Court previously has stated that "[p]otential impact is measured at the time of the attempt, *i.e.,* when the extortion demand is made, based on the assumed success of the intended scheme.  A sufficient potential impact exists when there is evidence of 'a plan to embark upon a course of extortionate behavior likely to have the natural effect of obstructing commerce.' "  *Farrell,* 877 F.2d at 875 (quoting *United States v. Gupton,* 495 F.2d 550, 551 (5th Cir.1974)) (internal citations omitted).[3]  In light of this precedent, we can affirm Le's convictions only if we find that his actions had either a potential effect or an actual, de minimis effect on interstate commerce.  On several occasions this Court has considered whether a defendant's actions had the potential to impact interstate commerce in order to satisfy the jurisdictional requirements of the Hobbs Act. In *Kaplan,* the defendant, who resided in Florida, had given power of attorney over two Panamanian bank accounts to another individual, who resided in Panama, in order to disguise his ownership of them.  *See Kaplan,* 171 F.3d at 1352.  That individual, however, took money from the accounts and threatened to report the defendant to the Internal Revenue Service if he pursued the matter.  *See id.* at 1352-53.  The defendant then enlisted someone with connections to the Panamanian Defense Force to coerce the individual in Panama holding power of attorney to transfer the funds to the defendant in Florida.  *See id.* at 1353.  The plan, however, was never carried out, and the funds were never transferred.  *See id.*  The defendant was later convicted by a jury of conspiracy to extort and attempted extortion in violation of the Hobbs Act. *See id.*

This Court upheld the defendant's two Hobbs Act convictions.  We first observed that "[t]he Hobbs Act, by its own terms, encompasses the inchoate offenses of attempt to extort and conspiracy to extort." *Id.* at 1354.  In such cases, we noted that "the government need only show a realistic probability of an effect, or some actual de minimis effect, on commerce to bring the extortion within the reach of the Hobbs Act." *Id.* Applying this standard, we stated that the Government had "brought forth evidence that, if [the defendant's] scheme had succeeded, commerce would have been affected." *Id.* at 1355.  Specifically, evidence at trial

---

[2]The Hobbs Act expressly covers both robbery and extortion cases. The extortion cases setting forth the Government's burden of proof in Hobbs Act prosecutions are equally applicable in the robbery context.

[3]Other circuits also focus on a potential impact on interstate commerce, measured from the time of the attempt.  *See, e.g., United States v. Nguyen,* 246 F.3d 52, 54 (1st Cir.2001) ("All that matters is that [the defendant] entered a conspiracy whose *objective* was to steal the assets of an entity in interstate commerce.  That the conspiracy failed to accomplish such objective is irrelevant.") (emphasis in original); *United States v. DiCarlantonio,* 870 F.2d 1058, 1061 (6th Cir.1989) (noting that "the courts have concluded that 'factual impossibility is no defense to an inchoate offense' under the Hobbs Act") (quoting *United States v. Brooklier,* 685 F.2d 1208, 1217 (9th Cir.1982)).

indicated that "[t]he conspiracy *required* at least one transaction between Florida and Panama—the payment of the extortion demand to [the defendant]—for the conspiracy to be of benefit to the coconspirators." *Id.* (footnotes omitted) (emphasis in original). Because the defendant sought these specific funds and planned to pay the co-conspirators from them, we stated that "the jury was entitled to find that the movement of substantial funds from Panama to Florida was the object of the co-conspirators' extortion plan." *Id.* (citations omitted). Thus, we concluded that "[i]n this case, a close and continuing nexus exists between the acts of coercion and the transmittal of the funds to Florida: the plan would have served no purpose if the money was not ultimately received by [the defendant] in Florida." *Id.*

In addition to this potential impact on interstate commerce that the plan would have had if it had come to fruition, we observed that those efforts taken in furtherance of the extortion plan had an actual effect on commerce. Specifically, the plan "was orchestrated in the United States to be carried out in another country," which "necessitated activity in interstate and foreign commerce to coordinate the scheme." *Id.* at 1355-56. Also, we noted that the co-conspirators spoke on the telephone while in different parts of the country. *See id.* at 1356. We then stated that "the use of interstate or foreign transportation and communication facilities to carry out a scheme of robbery or extortion may constitute—in conjunction with other facts—a sufficient effect upon commerce for a Hobbs Act conviction for conspiracy or attempt to extort." *Id.* (citing *United States v. Atcheson,* 94 F.3d 1237, 1243 (9th Cir.1996)). We thus held that "the potential effects, combined with the evidence of actual effects, are sufficient to establish the minimal effect on commerce required under the Hobbs Act." *Id.*

This Court also addressed the potential effects on interstate commerce of an attempted extortion scheme in *United States v. Farrell,* 877 F.2d 870 (11th Cir.1989), in which we affirmed the defendants' convictions for conspiracy to extort in violation of the Hobbs Act. In that case, the defendants kidnaped the daughter of an officer of a company that was engaged in interstate commerce. *See id.* at 872-73. In response to a ransom note, the officer and his wife executed a note payable to a federal savings and loan association and secured by their home and 30,000 shares of stock. *See id.* at 873-74.

In affirming the defendants' conspiracy convictions, this Court observed that "[h]ad the [defendants'] extortion scheme succeeded, the likely natural effect was that interstate commerce would have been affected," in three possible ways: (1) it was "inferable" that the savings and loan would have made a claim the denial or payment of which "necessarily would implicate interstate commerce to some degree," *id.* at 875; (2) "the

sheer size of the extortion demand implie[d] that the utilization of the funds by the [defendants] would have affected interstate commerce to a legally cognizable degree," *id.* at 875-76; and (3) the victims' pledge of their stock "represented an actual obstruction of their right to freely trade the shares on the New York Stock Exchange," *id.* at 876.[4] In light of this trio of potential effects on interstate commerce, we concluded that the nature of the defendants' plan to extort money provided jurisdiction under the Hobbs Act.

In a recent case, this Court applied these same principles to robberies and acts of extortion directed at individuals rather than businesses. *See Diaz,* 248 F.3d at 1084. In *Diaz,* we observed that "[w]hile the Hobbs Act usually is applied to robberies of businesses, criminal acts directed toward individuals also may violate the Hobbs Act." *Id.* We then noted:

> Robberies or extortions perpetrated upon individuals are prosecutable under the Hobbs Act when any one of the following three conditions are met: (1) the crime depletes the assets of an individual who is directly engaged in interstate commerce; (2) the crime causes the individual to deplete the assets of an entity engaged in interstate commerce; *or* (3) the number of individuals victimized or the sums involved are so large that there will be a cumulative impact on interstate commerce.

*Id.* at 1084-85 (emphasis in original) (citations omitted). We defined what it meant to "deplete the assets" of an individual broadly, by stating that it encompassed actions that "lessen[ed] in number" an individual's assets. *See id.* at 1090.

In *Diaz,* a jury convicted multiple defendants of committing and attempting to commit crimes—including conspiracy to commit a Hobbs Act violation, attempt to commit a Hobbs Act violation, and a series of substantive Hobbs Act violations—directed at three sets of individuals in different incidents. *See id.* at 1081-82. The defendants challenged their convictions, arguing that the Government had failed to demonstrate the requisite effect on interstate commerce. *See id.* at 1087.

This Court affirmed the defendants' Hobbs Act convictions. In one of the three incidents underlying the case, the victims were officers of a corporation that purchased some of its equipment from out of state. *See id.* at 1088. Several of the defendants kidnaped one of these individuals and sought a ransom, while

---

[4]This Court subsequently rejected as dicta the suggestion that the size of an extortion demand was relevant to the interstate commerce inquiry in a Hobbs Act case, stating, "[a]lthough a few courts have suggested that the sheer size or scope of an extortion plot might provide the required effect on commerce, no court has converted the state crime of extortion into a federal matter simply by virtue of its size. If such a theory could provide a sufficient nexus to interstate commerce there would be no need to engage in the extensive analyses of how particular acts of extortion affected a victim's position in interstate commerce that are so prevalent in Hobbs Act cases." *United States v. Kaplan,* 133 F.3d 826, 830-31 (11th Cir.1998) (internal footnote omitted), *vacated on other grounds,* 171 F.3d 1351 (11th Cir.) (*en banc*), *cert. denied,* 528 U.S. 928, 120 S.Ct. 323, 145 L.Ed.2d 252 (1999). To the extent this language limits the holding in *Farrell,* however, it is not relevant to the facts of our case, as the amount of money at stake in the robbery of the Nguyens' home is of little analytical importance.

others robbed his home. *See id.* at 1075. In affirming the defendants' convictions with respect to this incident, we stated that "the role of [the victims of the extortion] with regard to their business, which was directly engaged in interstate commerce, was not coincidental. Rather, the Court is convinced by the evidence presented at trial that [the defendants] targeted [the victims] *because of* their interest" in the business. *Id.* at 1088-89 (emphasis in original).[5]

In another of the three underlying criminal episodes in *Diaz,* the facts of which are quite similar to those in the present case, one of the defendants received a "tip" that an individual who was a part owner of a gas station with a convenience store kept a large amount of money in a safe in his house. *See id.* at 1079. The gas station purchased many of its supplies from out-of-state. *See id.* at 1091. Several of the defendants entered the victim's house and searched for the reported safe, but they were unsuccessful in their quest and fled the premises. *See id.* at 1079-80. The defendants later kidnaped the individual and demanded that he divulge the alarm code to another home which he shared with his girlfriend. *See id.* at 1081. The victim complied and the defendants stole various items from the home, including $30,000 in cash receipts from the victim's business. *See id.*

This Court affirmed the defendants' convictions based on this incident for attempted robbery and extortion in violation of the Hobbs Act. In so doing, we stated, "[d]etermining whether there was an effect on interstate commerce requires an examination of [the victim] and his businesses and their nexus, if any, to interstate commerce." *Id.* at 1091. We then noted that the victim's "business made regular and systematic purchases from out-of-state thereby establishing a greater connection to interstate commerce." *Id.* We continued, "[t]he Court finds that a reasonable jury could conclude that, as part owner of [the gas station], [the victim] was directly engaged in interstate commerce through his business." *Id.* Applying the standards set forth above, we found that the attempted robbery "would have depleted," and that the subsequent extortion did deplete, the victim's business assets. *Id.* We therefore upheld the defendants' conviction for affecting interstate commerce by robbery and extortion and for attempting to do so.

---

[5] In a factually similar case, the Sixth Circuit stated that the existence of such motivation could be sufficient to sustain a conviction for conspiracy under the Hobbs Act: "We have suggested that the Government might make such a showing by demonstrating that the defendant knew of or was motivated by the individual victim's connection to interstate commerce." *United States v. Wang,* 222 F.3d 234, 240 (6th Cir.2000) (citing *United States v. Mills,* 204 F.3d 669, 670 (6th Cir.2000)). In *Mills,* the Sixth Circuit held that the solicitation of bribes from individuals gave rise to federal jurisdiction under the Hobbs Act because the defendants "had actual knowledge that the bribe money would be obtained through loans made in interstate commerce." *Mills,* 204 F.3d at 670.

Applying the above standards to this case, we are compelled to conclude that Le's attempted robbery of the business assets kept at the Nguyens' house had both potential effects and actual, de minimis effects on interstate commerce, the combination of which supports the existence of a nexus between Le's actions and interstate commerce that supplies jurisdiction over both of his Hobbs Act convictions.

First, the evidence in the record indicates that the robbery organized by Le, if successful, would have affected interstate commerce. Although the rent-a-robbers could have absconded with only six to eight thousand dollars rather than the one hundred thousand dollars Le believed they would find, this amount was nonetheless equivalent to or greater than the Nguyens' total annual expenditures on manicure supplies from out-of-state. Thus, had the robbery been successful, it quite conceivably could have delayed or even reduced the Nguyens' interstate acquisition of the supplies required to operate their business.[6]

Second, like in *Kaplan,* the preparation for the robbery involved the use by Le and his co-conspirators of both interstate travel and interstate communication. The five perpetrators in this case traveled from California to Florida—two by car, three by air.[7] Also, Le placed at least one phone call to his acquaintances

[6]It could be argued that even if the robbery had been successful, the Nguyens could have sustained their purchase of supplies through funds kept in the Nguyens' bank account or some other source. Were such supposition supported by the evidence in the record—and it is not clear that it is—we are still required to draw all inferences in favor of the jury's verdict. *See Guerra,* 164 F.3d at 1359. Therefore, because the jury found Le guilty of the Hobbs Act charges, we conclude that the taking of the cash in Kenny Nguyen's possession on the night of the robbery would have limited his ability to purchase supplies from another state and thus affected interstate commerce.

[7]Le argues that we should not find Hobbs Act jurisdiction in this case on the basis of this interstate travel because to do so "will obliterate the distinction between the Hobbs Act and the Travel Act." The Travel Act provides:

> (a) Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to—
>
> (1) distribute the proceeds of any unlawful activity; or
>
> (2) commit any crime of violence to further any unlawful activity; or
>
> (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
>
> and thereafter performs or attempts to perform—
>
> (A) an act described in paragraph (1) or (3) shall be fined under this title, imprisoned not more than 5 years, or both; or
>
> (B) an act described in paragraph (2) shall be fined under this title, imprisoned for not more than 20 years, or both, and if death results shall be imprisoned for any term of years or for life.

in order to recruit them. When these actual, de minimis effects on interstate commerce are combined with the potential effects on interstate commerce that the robbery would have had if it had been successful, we are compelled to conclude that there was sufficient evidence of a nexus between Le's actions and interstate commerce to find jurisdiction under the Hobbs Act for Le's conviction of conspiring and attempting to violate the Hobbs Act.

Under the circumstances presented in this case, the fact that Le targeted an individual's private residence, rather than his business, does not attenuate the connection between Le's actions and interstate commerce.[8] Indeed, in light of this Court's precedent in *Diaz,* the fact that Le targeted an individual's home does not preclude a finding of Hobbs Act jurisdiction in this case. Rather, the overall circumstances of this case indicate that the Government has satisfied its burden in proving the requisite connection of the actions at issue here to interstate commerce.

## II. *Post-Arrest Statements*

Le argues that the Government violated his Fifth and Sixth Amendment rights by questioning him without an attorney present and by coercing him into signing a waiver of his *Miranda* rights and giving an inculpatory statement by implicitly threatening his family. He contends that the FBI knew he had a lawyer because he had been represented by a lawyer during the investigation. Le argues that this circuit ought to follow the Ninth Circuit in establishing a rule that, "when there is a close nexus between the focus of a pre-indictment investigation and the ultimate charges brought in the indictment, a defendant's ongoing relationship with counsel that is known (or should be known) by the government invokes the Sixth Amendment right to counsel once that right attaches." *United States v. Harrison,* 213 F.3d 1206, 1213 (9th

---

18 U.S.C. § 1952. As we noted in *Kaplan,* however, "the same conduct may violate more than one statute." *Kaplan,* 171 F.3d at 1356 (citing *Missouri v. Hunter,* 459 U.S. 359, 366-68, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983)). At any rate, as discussed above, the fact that some of the co-conspirators traveled interstate is not the sole basis for jurisdiction under the Hobbs Act in this case, but rather, it is only one element which, in conjunction with other circumstances, provides that jurisdiction.

[8]Le argues that in a case in which the target of a robbery was an individual rather than a business, the connection between the robbery and interstate commerce will generally be too attenuated to support jurisdiction under the Hobbs Act, such that affirming his conviction would "extend[] the reach of the federal government to almost every robbery perpetrated against a private citizen who owns a business." As a preliminary matter, we note that the Le's dire prediction misapprehends the basis of our holding. Our conclusion that Le's actions implicated interstate commerce to a degree sufficient to create jurisdiction under the Hobbs Act is based on the fact that Le specifically targeted business assets that were temporarily kept at a private residence which, if stolen, had the potential to delay or obstruct the purchase of products from another state, and the fact that his preparation for the robbery involved the use of interstate travel and communication.

Cir.2000). Because Le did not argue in the district court that the Government knew or should have known that he was represented by an attorney, we review this question for plain error. *See United States v. Thayer,* 204 F.3d 1352, 1358 (11th Cir.2000).

We need not decide whether to adopt the rule Le seeks, because the record does not show plain error in any event. The district court did not err because Le has not shown that he had an ongoing relationship with counsel. In this case, evidence of the alleged ongoing attorney-client relationship is scant. Le testified that he had contacted a lawyer over a year before he was arrested who had told him not to take a polygraph test and who had written FBI Agent Chester to explain why he had told Le not to take the test. Le did not give the name of the lawyer, and there appears to be no other evidence of the letter in the record. Agent Chester testified that Le had contacted but not "retained" a lawyer concerning the polygraph. Other than the letter that Le claims "his" lawyer wrote the FBI concerning the polygraph, the FBI had no contact with any attorney claiming to be Le's lawyer.

Additionally, Le reiterates the argument he made in his motion to suppress that the FBI implicitly threatened his family and thus coerced him into admitting he was involved in planning the robbery. At the suppression hearing, the district judge evaluated the witnesses' credibility and rejected Le's testimony in favor of the FBI agent's account of the circumstances surrounding Le's statement. The court found that "Le was mirandized, voluntarily made a statement after having been mirandized and waived his rights; that he did not invoke any right to an attorney; that he did not refuse to provide information." The record provides no reason to disturb the district court's determinations of credibility. *See Equal Employment Opportunity Comm'n v. Joe's Stone Crab, Inc.,* 220 F.3d 1263, 1285-86 (11th Cir.2000).

III.    *English Transcripts of Telephone Conversations*

Le next contends that the district court erred by admitting into evidence for impeachment purposes, without objection, English-language transcripts of telephone conversations in Vietnamese between himself and his co-conspirators without playing the original recordings of those conversations for the jury. We conclude, however, that Le waived the right to challenge the transcripts. After Le testified in his defense, the government, in rebuttal, introduced certain Vietnamese-language audiotapes that contained conversations involving Le. The government's witness, a contract interpreter for the FBI, testified that the English-language transcripts accurately reflected the Vietnamese-language conversations on the tapes, and the transcripts and tapes were admitted without objection.

This circuit has adopted the following procedure for challenging the accuracy of an English-language transcript of a conversation conducted in a foreign language:

> Initially, the district court and the parties should make an effort to produce an "official" or "stipulated" transcript, one which satisfies all sides. If such an "official" transcript cannot be produced, then each side should produce its own version of a transcript or its own version of the disputed portions. In addition, each side may put on evidence supporting the accuracy of its version or challenging the accuracy of the other side's version.

*United States v. Cruz,* 765 F.2d 1020, 1023 (11th Cir.1985) (quoting *United States v. Wilson,* 578 F.2d 67, 69-70 (5th Cir.1978)). Le did not avail himself of any portion of these procedures. Le appears to assert that he was denied the opportunity to submit an alternative translation, because the prosecution did not provide him with the tapes. However, as the Government counters, the tapes were listed in its discovery report and on its proposed exhibit list. Furthermore, on redirect Le admitted to having listened to one of the tapes and testified that a word translated as "wrong" should have been translated as "differently." Defense counsel conducted a voir dire of the interpreter's credentials and did not oppose his qualifications. Le did not object to the admission of the transcripts. Neither party requested that the tapes be played before the jury. Le's counsel did not cross-examine the translator. Accordingly, Le clearly waived his right to challenge the translation and the transcripts. *See id.*

In any event, Le has failed to show any prejudice arising from the fact that the district court did not play the original recordings to the jury. He has not explained how the translations were inaccurate, nor has he indicated how playing the original recordings in court would have aided in his defense. Therefore, his claim would still fail in any event.

IV.     *Sentencing*

A.     *Seven-level increase for co-conspirators' discharge of a firearm*

Because of Amendment 599 to the Sentencing Guidelines and Le's consecutive 60-month sentence for his § 924(c) firearms offense, the district court erred by also applying a seven-level firearm increase under U.S.S.G. § 2B3.1(b)(2)(A) to Le's offense level for his two Hobbs Act convictions.

Amendment 599 of the 2000 Amendments to U.S.S.G. § 2K2.4 rejected the interpretation of the sentencing guidelines previously followed by this circuit, which allowed an increase in a defendant's offense level for the underlying offense based on a co-conspirator's use of a firearm in addition to a consecutive sentence under § 924(c) for another firearm. *See, e.g., United States v. Rodriguez,* 65 F.3d 932 (11th Cir.1995); *United States v. Mitchell,* 146 F.3d 1338 (11th Cir.1998). Specifically, Amendment 599

significantly altered both the language and substance of Application Note 2 to U.S.S.G. § 2K2.4. Revised

Application Note 2, which went into effect November 1, 2000, states:

> If a sentence under this guideline is imposed in conjunction with a sentence for an underlying offense, do not apply any specific offense characteristic for possession, brandishing, use, or discharge of an explosive or firearm when determining the sentence for the underlying offense.

U.S.S.G. Manual § 2K2.4, note 2 (2000). The revised Application Note includes a prohibition directly on

point with Le's situation: "Do not apply any weapon enhancement in the guideline for the underlying offense,

for example, if (A) a codefendant, as part of the jointly undertaken criminal activity, possessed a firearm

different from the one for which the defendant was convicted under 18 U.S.C. § 924(c) ...." *Id.*

The Sentencing Commission has specifically indicated that Amendment 599 applies retroactively.

*See* U.S.S.G. § 1B1.10(c) (Nov. 2000). Furthermore, Amendment 599, which effects a revision of

Application Note 2, is binding on federal courts. Indeed, the Supreme Court has held that "[a]mended

commentary [to the sentencing guidelines] is binding on the federal courts even though it is not reviewed by

Congress, and prior judicial constructions of a particular guideline cannot prevent the Sentencing Commission

from adopting a conflicting interpretation," unless the interpretation violates the Constitution or a federal

statute or is plainly erroneous or inconsistent with the regulation it interprets. *Stinson v. United States,* 508

U.S. 36, 37, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993). The interpretation suggested by revised Application

Note 2 does not violate the Constitution or a federal statute and is not plainly erroneous or inconsistent with

U.S.S.G. § 2K2.4. The Supreme Court has also stated that if a court fails to follow or misreads the

commentary in imposing a sentence, the sentence should be set aside under 18 U.S.C. § 3742(f)(1) unless the

error was harmless. *See Stinson,* 508 U.S. at 42-43, 113 S.Ct. 1913.

The district court's error in Le's sentencing was not harmless. Were it not for the erroneous

application of the adjustment for his co-conspirators' use of a firearm, Le would not have received the

seven-level increase, which significantly increased the guideline range of his prison sentence from 121-151

months to 262-327 months. Accordingly, we remand for re-sentencing on the two Hobbs Act convictions

without the seven-level increase.[9]

---

[9]U.S.S.G. § 1B1.10(b) provides:

> In determining whether, and to what extent, a reduction in the term of imprisonment is warranted for a defendant eligible for consideration under 18 U.S.C. § 3582(c)(2), the court should consider the term of imprisonment that it would have imposed had the amendment(s) to the guidelines listed in subsection (c) been in effect at the time the defendant was sentenced, except that in no event may the reduced term of imprisonment

*B.      Two-level increase for car-jacking*

Pursuant to U.S.S.G. § 2B3.1(b)(5), the district court increased Le's offense level by two levels because the robbery involved a car-jacking by his co-conspirators. Le contends that this increase violated *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (1999). Specifically, he maintains that the district court erred by sentencing him to a total of 262 months for his two Hobbs Act convictions, based in part on an adjustment for car-jacking, when those convictions under § 1951 carried a 20-year (240-month) statutory maximum sentence. He argues that because the indictment did not charge him with car-jacking and the issue was never submitted to the jury, his enhanced sentence violates *Apprendi.*

*Apprendi* does not apply to Le's sentence. First, *Apprendi* does not apply to calculations under the guidelines. *See United States v. Nealy,* 232 F.3d 825, 829 n. 3 (11th Cir.2000) ("The Sentencing Guidelines are not subject to the *Apprendi* rule."). Second, to the extent Le contends that the carjacking increase caused his sentence to exceed the statutory maximum penalty, *Apprendi* is inapplicable, because neither his 240-month sentence for conspiracy nor his 22-month sentence for robbery exceeded the prescribed statutory maximum penalties for those convictions. *See United States v. Gerrow,* 232 F.3d 831, 834 (11th Cir.2000) (holding that "there is no error, plain or otherwise, under *Apprendi* where the term of imprisonment is within the statutory maximum").

Le was convicted of two separate violations of the Hobbs Act—conspiracy and robbery. The Supreme Court has held that convictions under the Hobbs Act for conspiracy and for the substantive offense are separate crimes that can be punished with consecutive sentences. *See Callanan v. United States,* 364 U.S. 587, 597, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961); *see also* U.S.S.G. § 5G1.2(d) (authorizing consecutive sentences to the extent necessary to produce a combined sentence equal to the "total punishment" required under the sentencing guidelines).

Consistent with this authorized practice, the district court sentenced Le to a custodial sentence of 240 months for the conspiracy conviction in Count I and 22 months consecutive to Count I for the robbery conviction in Count II.[10] The statutory maximums for those charges were twenty years apiece. *See* 18 U.S.C. § 1951(a). Therefore, neither of Le's sentences for his Hobbs Act violations were "more severe than the

---

be less than the term of imprisonment the defendant has already served.

[10]The district court also sentenced Le to a consecutive 60-months sentence for using and carrying firearms during and in relation to the commission of the crimes in the first two counts, which Le does not challenge.

statutory maximum for the offense established by the jury's verdict." *Apprendi,* 530 U.S. at 487 n. 13, 120 S.Ct. 2348. Accordingly, we affirm the district court's award of a two-level increase for car-jacking.[11]

V.    *Ineffective Assistance*

Finally, Le asserts that he was denied effective assistance of counsel due to his counsel's failure (1) "to advise the district court at the Suppression Hearing that Appellant was represented by counsel at the time of his arrest and interrogation;" (2) "to confront the FBI Agent with his conversations with a government informant who attempted to elicit information from Le while he was in custody awaiting trial;" (3) "to demand that the tapes used to impeach the defense witnesses be played for the witnesses;" and, (4) "to prepare an alternative translation of the tapes to challenge the accuracy of the translation offered by the Government." Le asserts that "information dehors the record reveals that a local attorney who had been hired by [Le] when he was first questioned by Agent Chester on February 23, 1998 wrote a letter to Chester explaining why [Le] refused to submit to a polygraph on advice of counsel. This letter (which also constitutes Brady material) was never produced by the Government."

Claims of ineffective assistance of counsel generally are not considered for the first time on direct appeal unless the record is sufficiently developed. *See United States v. Tyndale,* 209 F.3d 1292, 1294 (11th Cir.2000) (citations omitted). Because, by Le's own admission, the record is insufficient here to decide whether Le received ineffective assistance of counsel, we do not decide the ineffective assistance claim. *See id.* (affirming the convictions but not deciding the ineffective assistance claims due to insufficiency of the record); *United States v. Mayes,* 158 F.3d 1215, 1219 n. 6 (11th Cir.1998).

CONCLUSION

Other than the seven-level firearm increase in calculating the total offense level on the Hobbs Act convictions, all of the district court's rulings in this case were free from error. Accordingly, we affirm Le's convictions and affirm in part and vacate in part his sentence. We affirm Le's sentence except for the imprisonment portion of his sentence on the two Hobbs Act convictions. We vacate only that imprisonment

---

[11]We recognize that on remand, Le's lower offense level for his Hobbs Act violations without the seven-level firearm will result in a reduced guideline range and a reduced sentence to some extent. However, it remains that *Apprendi* does not apply when the sentences on two related offenses are allowed to run consecutively under the relevant law and the sentence on *each* offense does not exceed the prescribed statutory maximum for that particular offense.

portion and remand for re-sentencing in that regard on the two Hobbs Act convictions.[12]

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

---

[12]Specifically, the district court is permitted to reconsider and recalculate Le's total offense level for the two Hobbs Act violations and is not required to simply deduct mathematically the seven-level firearm increase. Although the district court may ultimately decide to do that, our point is only that because the imprisonment portion of Le's sentence has been vacated, the district court, as the sentencing judge, is allowed to reconsider any aspects of the total offense level in determining the term of imprisonment for Le's Hobbs Act convictions